Mary FORSYTH; Marrietta Cade; Willie Andrews; Mary Lou Buehler; Helen Staves; Randolph Bratton; and Searle Auto Glass, Inc., doing business as Best Glass Company, Plaintiffs,

v.

HUMANA, INC., a Delaware corporation; Humana Health Insurance of Nevada, Inc., a Nevada corporation; and Does I through X, inclusive, Defendants.

No. CV–S–89–249–PMP (LRL).

United States District Court, D. Nevada.

July 21, 1993.

J. Randall Jones, John Field, Jones, Jones, Close & Brown, Will Kemp, Harrison Kemp, Chartered, Las Vegas, NV, Stanley M. Chesley, Waite, Schneider, Bayless & Chelley, L.P.A., Cincinnati, OH, John J. Cummings, Richard M. Martin, Jr., W.B. Markovitis, Cummings, Cummings & Dudenhefer, New Orleans, LA, Wendell H. Gauthier, Gauthier & Murphy, Metairie, LA, G. Robert Blakey, Notre Dame Law School, Notre Dame, IN, for plaintiffs.

Dennis Kennedy, Louis Garfinkel, Lionel Sawyer & Collins, Las Vegas, NV, Mark Biros, Joseph E. Casson, Michael F. Moses, Thomas H. Brock, Burton J. Fishman, Lisolette Mitz, Proskauer Rose Goetz & Mendelson, Robert Eccles, O'Nelveny & Myers, Washington, DC, for defendants.

## MEMORANDUM DECISION AND ORDER

PRO, District Judge.

Plaintiffs are employers and employees who contracted for health insurance, through employee benefit plans, with Defendant Humana Health Insurance of Nevada, Inc. ("Humana Insurance"), during the period 1985 to 1988. One group of Plaintiffs used the health care services of Humana Hospital–Sunrise ("Sunrise Hospital"), an acute care facility located in Las Vegas, Nevada, which is owned and operated by Defendant Humana, Inc. ("Humana"), and a Participating Hospital under the insurance agreements. The insurance agreements required those insured with Humana Insurance to pay all expenses up to the designated deductible amount, and 20% of the expenses beyond that, with the insurance company to pay the other 80%. The liability of an insured had a cap called a "personal expense limit" which was the maximum the insured would have to pay in any given year, regardless of the total health care expenses.

In 1984, Humana Insurance and Sunrise Hospital entered into an agreement whereby Humana Insurance would pay Sunrise Hospital a discounted amount for that portion of the hospital charges for which it was responsible. However, the portion of the charges paid by the insureds was not discounted but was still based on the usual and customary rates. Plaintiffs assert that Humana Insurance failed to pass along the discounts it had arranged for itself to its insureds either in the form of reduced premiums or reduced co-payments.

Previous Orders of this Court have granted Plaintiffs' Motions for Class Certification, thereby permitting both a Premium Payor Class and a Co–Payor Class to maintain this action. By their Second Amended Complaint (# 370), filed August 12, 1991, Plaintiffs assert three claims for relief. Plaintiffs' First Claim for Relief is brought by the Co–Payor Class which consists of employees who obtained health insurance benefits under an employee benefit plan as defined under the Employment Retirement Income Security Act (ERISA), 29 U.S.C. § 1001, et seq. There Plaintiffs allege that Defendants breached fiduciary duties owed to the Co–Payor Class under ERISA; engaged in transactions prohibited by ERISA; and retained excessive compensation. Plaintiffs' Second Claim for Relief alleges a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 and is brought on behalf of the Co–Payor Class and Premium Payor Class, which consists of individuals or entities paying all or a portion of the Humana–Insurance premiums during the period 1985 to 1988. Plaintiffs' Third Claim for Relief, brought on behalf of both the Co–Payor Class and Premium Payor Class, alleges that Defendants engaged in a scheme to defraud in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968.

Before the Court is a Motion for Summary Judgment (# 804), filed on June 22, 1993, by

Defendants Humana and Humana Insurance. On July 7, 1992, Defendants filed a Correction (# 808). Plaintiffs filed their Opposition (# 820) on August 7, 1992, which was followed by an Errata (# 822) filed on August 12, 1992. Defendants filed their Reply (# 841) accompanied by a Supplemental Affidavit (# 842) on October 19, 1992.

Additionally, the parties have filed the following supplementary motions:

(1) Supplement to Plaintiffs' Opposition (# 834), filed on September 30, 1992.

(2) Second Supplement to Plaintiffs' Opposition (# 849), filed on November 16, 1992.

(3) Defendants' Supplemental Memorandum (# 868), filed on February 22, 1993. Plaintiffs filed a Third Supplement and Opposition (# 890) on May 17, 1993. On June 2, 1993, Defendants filed a Supplemental Memorandum (# 895) in response.

(4) Defendants' Second Supplemental Memorandum (# 891), filed on May 21, 1993.

(5) Plaintiffs' Fourth Supplement to Opposition (# 896), filed on June 8, 1993. Defendants filed a Response (# 909), on July 1, 1993.

(6) Defendants' Third Supplemental Memorandum (# 901), filed on June 23, 1993. Plaintiffs filed a Response to Defendants' Second and Third Supplemental Memoranda (# 908) on July 1, 1993.

(7) Plaintiffs' Response to (# 895) and Fifth Supplement to Opposition (# 902), filed on June 25, 1993.

(8) Defendants' Supplemental Memorandum of Points and Authorities (# 903), filed on June 29, 1993.

(9) Defendants' Fourth Supplemental Memorandum (# 910), filed on July 2, 1993.

On July 7, 1993, this Court heard oral argument on Defendants' Motion for Summary Judgment and its progeny.

## I. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The party moving for summary judgment has the initial burden of showing the absence of a genuine issue of material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir.1982). Once the movant's burden is met by presenting evidence which, if uncontroverted, would entitle the movant to a directed verdict at trial, the burden then shifts to the respondent to set forth specific facts demonstrating that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). If the factual context makes the respondent's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *California Arch. Bldg. Prod. v. Franciscan Ceramics*, 818 F.2d 1466, 1468 (9th Cir.1987), *cert. denied*, 484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988).

If the party seeking summary judgment meets this burden, then summary judgment will be granted unless there is significant probative evidence tending to support the opponent's legal theory. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968); *Commodity Futures Trading Commission v. Savage*, 611 F.2d 270 (9th Cir.1979). Parties seeking to defeat summary judgment cannot stand on their pleadings once the movant has submitted affidavits or other similar materials. Affidavits that do not affirmatively demonstrate personal knowledge are insufficient. *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir.1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). Likewise, "legal memoranda and oral argument are not evidence and do not create issues of fact

capable of defeating an otherwise valid motion for summary judgment." *Id.*

A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth. *See Admiralty Fund v. Hugh Johnson & Co.,* 677 F.2d 1301, 1305–06 (9th Cir. 1982); *Admiralty Fund v. Jones,* 677 F.2d 1289, 1293 (9th Cir.1982).

All facts and inferences drawn must be viewed in the light most favorable to the responding party when determining whether a genuine issue of material fact exists for summary judgment purposes. *Poller v. CBS, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). After drawing inferences favorable to the respondent, summary judgment will be granted only if all reasonable inferences defeat the respondent's claims. *Admiralty Fund v. Tabor,* 677 F.2d 1297, 1298 (9th Cir.1982).

The trilogy of Supreme Court cases cited above establishes that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.,* 477 U.S. at 327, 106 S.Ct. at 2554, *quoting* Fed.R.Civ.P. 1. *See also Avia Group Int'l, Inc. v. L.A. Gear Cal.,* 853 F.2d 1557, 1560 (Fed.Cir.1988).

## II. ERISA

### A. *Facts & Procedural History*

In their First Claim for Relief, Plaintiffs' Co–Payor Class seeks approximately $85 million in damages against Defendant Humana Insurance for violation of its fiduciary duties under ERISA.

At the heart of this entire case is a provision within the Humana Care Plus Policy under which members of the Co–Payor Class were insured. This provision states that the employee/insured would pay 20% of all covered charges incurred while in a hospital up to a certain amount (usually $5,000), and that

Humana Insurance would be responsible for the remaining 80%. See Opposition (# 820), Exhibit 85 at 7–1 (Humana Insurance master group health insurance policy HCP–84–NV–1).[1] From 1984 to 1988, Humana Insurance obtained substantial discounts, allegedly between 40% and 96%, from Sunrise for services rendered to the insureds in the Co–Payor Class. Errata (# 822) at 49–50, Exhibit # 39; Opposition (# 820), Exhibits 38, 40. Instead of sharing these discounts with the insureds by reducing the amount of co-payments due, Humana Insurance only applied the discount to the amount for which they would have been responsible under the policy. Motion for Summary Judgment (# 804) at 10–12.

Based on these actions, the Co–Payor Class asserts that Humana Insurance breached several of its fiduciary duties under ERISA including:

(1) Humana Insurance engaged in a transaction involving the plan on behalf of a party, Sunrise, whose interests were adverse to those of the health benefits plans and/or its participants or beneficiaries in violation of 29 U.S.C. § 1106(b)(2);

(2) Humana Insurance dealt with plan assets in its own interest or for its own account by erroneously interpreting the individual insurance contracts as requiring co-payments based on gross charges and effectuating the co-payment billings through contract administration in violation of 29 U.S.C. § 1106(b)(1);

(3) Humana Insurance received consideration (e.g. the discounts) from Sunrise involving the assets of the plan in violation of 29 U.S.C. § 1106(b)(3);

(4) Humana Insurance did not act in the sole interest of the insureds in interpreting the insurance contracts in violation of 29 U.S.C. § 1104(l)(A)(i);

(5) Humana Insurance failed to discharge its duties with respect to the plan in accordance with the documents and instruments

---

**1.** Accordingly, in addition to any premiums which were paid to Humana Insurance by the employer or employee, the employee/insured would ultimately be responsible for up to $1,000 (20% of $5,000) before Humana would absorb 100% of covered hospital charges. Errata (# 822) at 123–125.

governing the plan in violation of 29 U.S.C. § 1104(1)(D).

See Errata (# 822) at 173–193.

On September 26, 1989, this Court denied Defendant Humana Insurance's Motion to Dismiss (# 13) the Co–Payor Class' claim for breach of fiduciary duty. In denying Humana Insurance's Motion, this Court held, citing *Sixty–Five Security Plan v. Blue Cross and Blue Shield*, 583 F.Supp. 380, 387 (S.D.N.Y. 1984), *aff'd on reh'g*, 588 F.Supp. 119 (1984), that given the discretion of Humana Insurance to negotiate reimbursement rates on behalf of the health benefit plans, Humana Insurance should be considered a fiduciary under ERISA. Order (# 79) at 9. This Court further held that the plain meaning of the contract language indicated that the insureds should have paid 20% of the net hospital charge and not the gross charge, and consequently, by failing to distribute the negotiated discount among the Co–Payor Class, Humana Insurance may have violated its fiduciary duties. *Id.* at 10. Finally, this Court found that Humana Insurance's failure to reduce its insurance premiums did not constitute a breach of fiduciary duty and that the establishment of co-payment rates was distinguishable from the fiduciary duties imposed in the approval or denial of insurance claims. *Id.* at 6–9, 10.

On July 9, 1991, this Court entered a second Order (# 364) which again refused to dismiss the Co–Payor Class' claim for breach of fiduciary duties under ERISA. In the Order, this Court reaffirmed its holding that Humana Insurance was a fiduciary under *Sixty–Five Security Plan* and acknowledged that the Co–Payor Class was also asserting that Humana Insurance engaged in prohibited transactions in violation of 29 U.S.C. § 1106(b). Order (# 364) at 4. This Court went on to hold that Plaintiffs were not asserting a claim for benefits [2], but instead were "seeking recovery for having overpaid hospital stays, because Humana Insurance as fiduciary should have acted in their interest and assured that Plaintiffs were not paying based on a 'fraudulent' rate." *Id.* at 6. In addition, in rejecting Humana Insurance's argument that Plaintiffs could not assert a claim for breach of fiduciary relief in their individual capacity, this Court found that:

> This case presents a unique situation in that the whole plan was affected by the alleged breach by Humana Insurance, but there was only monetary harm to individual participants and beneficiaries if and when they were required to pay copayments. The only meaningful remedy is recovery by these individual Plaintiffs, and the provisions of § 1132(a)(3) permit such recovery.

*Id.* at 14.[3]

In support of the instant Motion for Summary Judgment on Plaintiffs' ERISA claim, Defendant Humana Insurance advances three alternative arguments: (1) Plaintiffs are precluded from bringing a claim for breach of fiduciary duty since they are seeking relief to benefit only themselves (e.g., the Co–Payor Class) and not the plan as a whole [4]; (2) Humana Insurance did not act as a fiduciary in entering into the discount arrangement with Sunrise; and (3) if a claim for breach of fiduciary duty is allowed, monetary relief should be limited to recovery of the allegedly excessive coinsurance pay-

---

**2.** In the Order, this Court defined a "claim for benefits" as a situation where "an insured puts in a claim and the insurance company denies it." Order (# 364) at 6.

**3.** In so doing this Court primarily relied upon a broad interpretation of *Amalgamated Clothing & Textile Workers Union v. Murdock*, 861 F.2d 1406 (9th Cir.1988) and distinguished the holdings of *Massachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985) and *Sokol v. Bernstein*, 803 F.2d 532 (9th Cir.1986).

**4.** Defendant Humana Insurance claims that the total number of insureds who had a co-payment obligation to Humana Hospital Sunrise as a percentage of the number of total insureds was 11.68% (16,412/140,487), whereas the total number of insureds whose co-payment obligation would have declined if their coinsurance was calculated on the discounted amount as a percentage of the number of total insureds was 9.54% (13,049/140,487). Plaintiffs state that the 9.54% is not supported by the evidence, but do concede that not all employees covered under the various health plans were hospitalized at Humana Hospital Sunrise. Opposition (# 820), Exhibit 93; Errata (# 822) at 207, n. 404.

ments. Motion for Summary Judgment (# 804) at 14–35.

Plaintiffs respond that: (1) this Court has already correctly ruled that regardless of the fact that only the Co–Payor Class was financially injured by Humana Insurance's discounting scheme, since all the insureds were "affected" by the scheme, the Co–Payor Class may properly pursue a constructive trust for Humana Insurance's alleged violations of fiduciary duty; (2) this Court correctly ruled that Humana Insurance was rendered a fiduciary by negotiating a discount with Humana Hospital Sunrise since such an act constituted discretion in the administration of a plan; and (3) under ERISA, damages for Humana Insurance's alleged breach of fiduciary duty should be measured by the sum of the total discount received by Humana Insurance from Sunrise and not simply the percentage of the discount that Humana Insurance should have shared under the terms of the insurance contract.

### B. *Discussion*

#### 1. May the Co–Payor Class Assert a Claim for Breach of Fiduciary Duty?

■ Notwithstanding this Court's Order (# 364) of July 9, 1991, Humana Insurance once again asserts that the Co–Payor Class may not pursue its claims for breach of fiduciary duty, as the class seeks monetary relief on behalf of themselves as individuals and not on behalf of their respective employee benefit plans. In support of its position, Humana Insurance cites two recent Ninth Circuit cases, *Horan v. Kaiser Steel Retirement Plan,* 947 F.2d 1412 (9th Cir.1991) and *Williams v. Caterpillar, Inc.,* 944 F.2d 658 (9th Cir.1991), as new authority upon which this Court should rely to reverse its earlier decision. Although it does not appear that

either of these cases charts new waters in the rough seas of ERISA interpretation, these decisions do present a forceful argument for reconsidering this Court's earlier interpretation of *Russell, Sokol,* and *Murdock.* See Order (# 364) at 7–14.

To begin, this Court reaffirms its earlier interpretation of *Russell* to the effect that the substantive remedies afforded by 29 U.S.C. § 1109 are limited, and that § 1109 does not allow for the recovery of extra-contractual damages by individual beneficiaries. See Order (# 364) at 8–9; *Russell,* 473 U.S. at 142–144, 105 S.Ct. at 3090–91. In coming to this conclusion, the Supreme Court in *Russell* specifically found that even though ERISA requires plan fiduciaries to serve the interests of participants and beneficiaries, § 1109 provides remedies for breach of fiduciary duties only on behalf of the plan, and not the individual beneficiary.[5] *Id.* Subsequently, the Ninth Circuit adopted the reasoning used in *Russell* to foreclose the availability of extra-contractual damages under 29 U.S.C. § 1132(a)(3). *See Sokol,* 803 F.2d at 534–537. In doing so, the Ninth Circuit emphasized, just as the Supreme Court did in *Russell,* that the remedies allowed under § 1132(a)(3) are limited and that § 1132(a)(3) "emphasizes the protection of the *plan,* not the direct protection of the beneficiaries." *Id.* 803 F.2d at 536–537.[6]

The two recent cases cited by Defendant Humana Insurance, *Horan* and *Williams,* restate the interpretation of *Russell* and *Sokol* summarized above. For example, in holding that Plaintiffs in *Horan* could not bring a claim for breach of fiduciary duty under § 1132(a)(3), the Ninth Circuit stated:

> An individual beneficiary may bring a fiduciary breach claim, but must do so for the benefit of the plan. An individual beneficiary may not pursue a fiduciary breach

---

**5.** More specifically, the Supreme Court stated:

A fair contextual reading of (§ 1109) makes it abundantly clear that its draftsmen were primarily concerned with the possible misuse of plan assets, and with remedies that would protect the entire plan, rather than with the rights of an individual beneficiary.... *[T]he entire text of (§ 1109) persuades us that Congress did not intend to authorize any relief except for the plan itself.*

*Russell,* 473 U.S. at 142, 144, 105 S.Ct. at 3090, 3091 (emphasis added).

**6.** This Court also recognizes that the position adopted by the Ninth Circuit in *Sokol* directly contradicts Justice William Brennan's interpretation of § 1132(a)(3) found in his concurring opinion in *Russell.* See Order (# 364) at 9; *Russell* (Brennan, J., concurring) 473 U.S. at 153–155, 105 S.Ct. at 3096–3097; *Sokol,* 803 F.2d at 534–538.

claim to recover benefits or remedies beyond those provided by a plan. Any recovery for a violation of sections 1109 and 1132(a)(2) must be on behalf of the plan as a whole, rather than inuring to individual beneficiaries. The Supreme Court reasoned the fiduciary duty provisions in ERISA are primarily concerned with protecting the integrity of the plan, which in turn protects all beneficiaries, rather than remedying each wrong suffered by individual beneficiaries.

We have extended the reasoning in *Russell* to section 1132(a)(3) which allows recovery of 'other appropriate equitable relief.' Section 1132(a)(3) also does not provide an action for an individual beneficiary to recover extra-contractual remedies. Under *Russell* and *Sokol*, the plaintiffs fail to present a fiduciary breach claim if the only remedy sought is for their own benefit, rather than for the benefit of the Plan as a whole.

*Horan* 947 F.2d at 1417–18 (citations omitted). Similarly, in *Williams* the Ninth Circuit recognized that "the Supreme Court has held that equitable relief under ERISA is limited to relief protecting the integrity of the plan as a whole and does not extend to individual plan participants." *Williams,* 944 F.2d at 665.

In this Court's previous Order (# 364) of July 9, 1991, it found that, based on *Murdock* and § 1132(a)(3), the only "meaningful remedy" in this case would be to allow the Co–Payor Class to sue Humana Insurance for breach of fiduciary duty. See Order (# 364) at 14. In light of the additional clarification yielded by the *Horan* and *Williams,* this Court now recognizes that this conclusion was incorrect.

First, it is undisputed that the members of the Co–Payor Class are seeking approximately $85 million in damages in their individual capacity for various breaches of fiduciary duty pursuant to § 1132(a)(3). As set forth in *Sokol, Horan,* and *Williams,* however, § 1132(a)(3) does not allow individual beneficiaries to sue for a breach of fiduciary duty on their own behalf. *See Horan,* 947 F.2d at 1417–18; *Williams,* 944 F.2d at 665; *Sokol,* 803 F.2d at 536–537.

Second, this Court's previous reliance on *Murdock* as authority for allowing the Co–Payor Class to seek damages under § 1132(a)(3) must be acknowledged as tenuous. Although the Court in *Murdock* did allow plan beneficiaries (and not the plan itself) to benefit from a constructive trust funded with the ill-gotten profits of the plan administrator, the Court in *Murdock* also limited its ruling to the "circumstances of this case." *Murdock,* 861 F.2d at 1417. These circumstances included the fact that (1) the ERISA plan which had been defrauded no longer existed, (2) under the terms of the plan (which were altered by the errant fiduciary) any damages paid to the plan would have simply reverted to the wrongdoer, and (3) the damages to be received for the breach of fiduciary duty were to be put into a constructive trust in favor of *all* plan participants. *Id.* at 1408–09, 1417.

Here, although Defendants' conduct as alleged by Plaintiffs is clearly questionable, the level of impropriety alleged is less severe than that which occurred in *Murdock.*[7] The injury in *Murdock* was directed primarily against the plan and not against particular beneficiaries, the various benefit plans purportedly affected by Humana Insurance's breach of fiduciary duty still exist, and, most importantly, this Court's prior Order (# 364) would afford relief only to a select group of beneficiaries. Upon reconsideration and based on these distinctions, this Court finds that *Murdock* does not provide persuasive authority to support this Court's earlier interpretation of § 1132(a)(3).[8]

---

**7.** In *Murdock,* the fiduciary used plan assets to further a "greenmail" scheme to benefit his own individual assets. After the scheme was successful (with both the plan and the fiduciary making substantial profits as a result), the fiduciary then amended the plan so that any excess funds would revert to the administrator. With the plan so changed, the fiduciary then paid all beneficiaries the value of their vested interests under the plan

and retained all excess monies for himself (e.g. the profits made by the plan based on the use of its assets in the greenmail scheme). *Murdock,* 861 F.2d at 1408–1409.

**8.** In the July 9, 1991 Order (# 364), this Court also cited *Call v. Sumitomo Bank,* 881 F.2d 626, 631–32 (9th Cir.1989) for the proposition that the *Russell* decision should not be narrowly con-

Finally, this Court also recognizes that a claim for breach of fiduciary duty is neither the only nor the most appropriate remedy for the wrongs asserted by the Co–Payor Class. After careful consideration of the facts and the injury alleged by the Co–Payor Class in this case, it is clear that the crux of the current dispute rests on the reasonableness of Humana Insurance's interpretation of the co-payment provision in the insurance contract. Such a claim is more appropriately brought pursuant to 29 U.S.C. § 1132(a)(1)(B) which allows a beneficiary to seek benefits due under the terms of the plan. *See e.g., Eaton v. Blue Cross and Blue Shield of Alabama,* 681 F.Supp. 759, 760–62 (S.D.Ala.1988). Accordingly, this Court finds that the cause of action provided by ERISA to compensate the Co–Payor Class for the questionable conduct of Humana Insurance is a claim for benefits pursuant to § 1132(a)(1)(B) and not a claim for breach of fiduciary duty under § 1109 or § 1132(a)(3).[9]

In sum, based on the holdings in *Horan, Williams* and *Sokol,* the limited precedential value of *Murdock,* and the availability of a more appropriate remedy pursuant to § 1132(a)(1)(B), this Court finds that the Co–Payor Class should not be allowed to pursue claims against Humana Insurance for breach of fiduciary duty. Accordingly, this Court hereby modifies its earlier Order (# 364) of July 8, 1991, and will grant Humana Insurance's Motion for Summary Judgment as to the first claim for relief set forth in Plaintiffs' Second Amended Complaint (# 370). Plaintiffs' Co–Payor Class will be permitted, however, to file a Third Amended Complaint seeking appropriate relief under § 1132(a)(1)(B).

### 2. Damages

■ This Court also finds that even if it were to allow Plaintiffs' Co–Payor Class to seek a claim for breach of fiduciary duty, Humana Insurance would still be entitled to partial summary judgment on the issue of damages.

Plaintiffs argue that "equity and poetic justice" require that Humana Insurance pay to the beneficiaries the entire discount it obtained from Sunrise.[10] Errata (# 822) at 126. In contrast, Humana Insurance asserts that Plaintiffs' calculations are incorrect, and that the appropriate measure of damages in this case would be simply a refund of the overcharged co-payment. See Reply (# 841) at 22–27.

Section 1109(a) provides that:

---

strued. This Court now concludes that the language used for this proposition was dicta, and furthermore, that the Court in *Call* itself recognized that " 'ERISA grants no private right of action by a beneficiary *qua* beneficiary; rather it *accords beneficiaries the right to sue on behalf of the entire plan* if a fiduciary breaches the plan's terms.' " *Id.* at 632, n. 13 (citing *Sokol* ). *See also Murdock,* 861 F.2d at 1417.

**9.** This Court also recognizes that in its Motion for Summary Judgment (# 804), Humana Insurance concedes that such a claim is proper, and has stipulated that to the extent the Co–Payor Class would be required to exhaust their administrative remedies prior to bringing a claim for benefits, such a requirement would be waived. See Motion for Summary Judgment (# 804) at 22. In addition, this Court finds that to avoid any unjust enrichment on the part of Humana Insurance, Plaintiffs would be entitled individually to obtain prejudgment interest for any relief provided under § 1132(a)(1)(B). *Rivera v. Benefit Trust Life Ins. Co.,* 921 F.2d 692 (7th Cir. 1991); *Short v. Central States, S.E. & S.W. Areas Pension Fund,* 729 F.2d 567, 576 (8th Cir.1984); *see also Blanton v. Anzalone,* 760 F.2d 989, 992–93 (9th Cir.1985).

**10.** The following discussion regarding the proper manner in which to calculate damages is applicable to a theory of liability predicated upon both § 1132(a)(1)(B) and breach of fiduciary duty. Thus, although this Court has disallowed Plaintiffs' fiduciary duty claim, this ruling does not affect the measure of damages to be awarded to Plaintiffs. Using the example provided by Plaintiffs, assume the following:

(1) Gross hospital charge = $5,000.
(2) Amount paid by insured = $1,000 (.20 × $5,000).
(3) Amount paid by Humana Insurance after taking an 89% discount = $550 (.89 × $5,000).
(4) Total amount paid to Sunrise = $1,550 ($1,000 + $550).

Plaintiffs argue that appropriate damages for Humana Insurance's breach of fiduciary duty would be to require it to "disgorge the entire 'secret' discount" obtained by Humana Insurance from Sunrise. Based on their statement that "disgorgement of the unilateral discounts actually requires Humana Insurance to pay 80% of the gross charges," this amount would presumably be $3,450 ($4,000 {.80 × $5,000} − $550). See Errata (# 822) at 123–26.

Any person who is a fiduciary with respect to the plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including the removal of such fiduciary.

Similarly, under § 1132(a)(3), a "beneficiary" may seek "other appropriate equitable relief" to redress breaches of fiduciary duty or to enforce the provisions or terms of the plan.

"Where there has been a breach of fiduciary duty, ERISA grants to the Courts broad authority to fashion remedies for redressing the interests of participants and beneficiaries." *Donovan v. Mazzola*, 716 F.2d 1226, 1235 (9th Cir.1983), *cert. denied*, 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984). Notwithstanding this, any loss or profit which is disgorged as a result of a breach of fiduciary duty must have a causal connection with the breach. *Leigh v. Engle*, 727 F.2d 113, 137 (7th Cir.1984). Uncertainties in the determination of damages, however, should be resolved against the wrongdoer. *Kim v. Fujikawa*, 871 F.2d 1427, 1431 (9th Cir.1989); *Leigh*, 727 F.2d at 138–39.

Plaintiffs argue that they are entitled to the entire discount yielded by Sunrise as this amount constitutes the ill-gotten profits Humana Insurance obtained as a result of its breach. The difficulty with Plaintiffs' position, however, is that their calculation ignores the facts of the case and has no "causal connection" to the breach.

To illustrate this, assume, as Plaintiffs do, that on a gross hospital charge of $5,000, the insured beneficiary paid $1,000 in co-payments and Humana Insurance paid $550 on its obligation. The net amount received by Sunrise equals $1,550, and the net discount given by the hospital amounts to $3,450.[11] Assuming Plaintiffs are correct in their interpretation of the co-payment provision that the insureds were responsible for 20% of the net charges and not the gross charges,[12] the amount which should have been paid by the insureds is $310 (.20 × $1,550). Therefore, since the insured paid $1,000 rather than the $310 which was required under the contract, the insured overpaid, and Humana Insurance profited, $690.

As illustrated above, it is clear that the amount asserted by Plaintiffs, or $3,450, is not a true measure of Humana Insurance's "ill-gotten profit." To adopt this figure would ignore the reality that the gross hospital charge ($5,000) was never in fact paid and would contradict Plaintiffs' interpretation of the co-pay provision that the 20/80 split should apply only on the net hospital charge ($1,550). Accordingly, since Plaintiffs' measure of damages fails to establish a "causal connection" between the actual profits obtained by Humana Insurance and its breach of fiduciary duty, their calculation of damages must be rejected.

The proper measure of damages would be to restore the trust beneficiaries to the position they would have occupied but for the breach of trust. *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2nd Cir.1985). Applying this remedy to the facts of the present situation, Humana Insurance would be required to disgorge the amount of the discount which it should have paid under the proper interpretation of the co-pay provision. Using the hypothetical insured described by Plaintiffs, this would amount to $690. In so doing, the primary purpose of § 1109(a) to "undo" the harm caused by the breach of fiduciary duty would be realized. The interests of the beneficiaries would be furthered by removing the fiduciary's ill-gotten profits, and consistent with the holding in *Leigh*, only those profits which are "causally connected" with Humana Insurance's breach of fiduciary duty would

11. Note that the net discount given on the hospital bill is 69% ($3,450/$5,000) and the net discount given on the portion of the bill for which Humana Insurance was responsible is 86.25% ($3,450/$4,000). Accordingly, Plaintiffs' assertion that Humana Insurance received an 89% discount is inaccurate. See *supra*, n. 10; Errata (# 822) at 124–125.

12. See Second Amended Complaint (# 370) at 8.

be disgorged. *See Leigh,* 727 F.2d at 138–139; *Bierwirth,* 754 F.2d at 1056.[13]

Accordingly, even if the Co–Payor Class could assert a claim for breach of fiduciary duty under the present facts, partial summary judgment would still be appropriate in this case with respect to Plaintiffs' excessively broad view of "ill-gotten profits." [14]

3. Leave to Amend Plaintiffs' Complaint

█ In their Opposition, Plaintiffs argue that in the "unlikely event that this Court completely reverses itself and rules that ERISA offers no remedy to Plaintiffs," this Court should allow Plaintiffs to reinstate their state law claims. Errata (# 822) at 95, n. 2. This Court disagrees.

First, under this Order, Plaintiffs are not without an ERISA remedy. The Co–Payor Class properly may file an Amended Complaint to state a claim under § 1132(a)(1)(B). See *supra* at 17. Moreover, Plaintiffs' state law claims (which would apply to Plaintiffs' recent proposed claim under Nevada's RICO statute, N.R.S. § 207.470) are preempted by ERISA. See Order (# 79) at 14–15; *Olson v. General Dynamics Corp.,* 960 F.2d 1418, 1420–23 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 2968, 119 L.Ed.2d 588 (1992); *Kanne v. Connecticut General Life Ins. Co.,* 867 F.2d 489, 493–494 (9th Cir.1988), *cert. denied,* 492 U.S. 906, 109 S.Ct. 3216, 106 L.Ed.2d 566 (1989).

Finally, as this Court has indicated previously, given the procedural history of this case which has seen three extensive rounds of dispositive motions, to allow the parties to address new theories of liability would strain the letter and spirit of Fed.R.Civ.P. 15(a).

Accordingly, Plaintiffs' request to reinstate their prior state law claims was properly denied in this Court's October 13, 1992 Order (# 840), and will not be reconsidered here.

### III. ANTITRUST

#### A. *Facts*

Plaintiffs' Second Claim for Relief seeks approximately $181 million in damages against Defendants Humana and Humana Insurance for monopolization or attempted monopolization under section 2 of the Sherman Act, 15 U.S.C. § 2. The "Antitrust Class" consists of individual employees and employers who allegedly paid excessive policy premiums and co-payments to Humana and Humana Insurance between 1985 and 1988. See Second Amended Complaint (# 370) at 11, ¶ 41; 17, ¶ 51.

In their opposition, Plaintiffs argue that Humana and Humana Insurance monopolized or attempted to monopolize two independent submarkets including: (1) Clark County for-profit acute care hospitals; and (2) those hospitals used by Humana Insurance's insureds. Errata (# 822) at 290–292.

As proof of this actual or attempted monopolization, the Antitrust Class alleges that during the relevant time period, Humana made "supracompetitive" or "monopoly" profits.[15] Plaintiffs maintain that with re-

---

**13.** In their Fourth Supplemental Opposition (# 896) Plaintiffs argue that the recent United States Supreme Court case *Mertens v. Hewitt Assocs.,* —— U.S. ——, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993), stands for the proposition that this Court has the ability to create a trust composed of all discounts yielded by Sunrise to Humana Insurance as a remedy for Humana Insurance's alleged breach of fiduciary duty. This Court disagrees. The primary holding of *Mertens* is that "appropriate equitable relief" under § 1132(a)(3) does not permit compensatory losses for breaches of fiduciary duty, but rather only traditional forms of equitable relief such as injunction, mandamus, and restitution of ill-gotten profits. *Id.* at ——, 113 S.Ct. at 2070. Such a holding does not aid Plaintiffs because, as discussed above, Plaintiffs' argument that the entire discount yielded by Sunrise to Humana

Insurance are Humana Insurance's "ill-gotten profits" is erroneous.

**14.** In light of this Court's findings regarding the Co–Payor Class' inability to pursue a claim for breach of fiduciary duty, this Court need not address Defendants' second argument that Humana Insurance was not a fiduciary when it negotiated the discount with Sunrise.

**15.** In support of the assertion that Humana made "supracompetitive" profits, Plaintiffs allege that: (1) Nevada hospitals have the highest profit margins in the country and that Sunrise was the most profitable hospital in Nevada; (2) Sunrise was the most profitable hospital in the Humana organization; (3) Notwithstanding the fact that Sunrise's market share decreased during the relevant time period, its net operating revenue during this period increased; and (4) During 1988

gard to the for-profit acute care hospital submarket, Sunrise had "60% of the licensed beds" and derived "58.6% of the total gross patient revenues excluding medicare and medicaid patients" during the relevant time period. *Id.* at 305. Also, with respect to the submarket of hospitals used by Humana Insurance's insureds, Plaintiffs allege that Sunrise enjoyed an 80% share within this market. *Id.*[16]

Plaintiffs claim that in order to maintain or enhance its monopolistic position, Defendants acted anti-competitively in several ways, including: (1) Humana refused to unbundle level III neonatal care to other health care plans; (2) Humana improperly diverted critical care patients to other hospitals; (3) Humana threatened to revoke physician office space if they did not admit patients to Sunrise; (4) the discount arrangement between Humana and Humana Insurance allowed Sunrise to understate hospital profits and avoid regulatory cost containment while misleading its insureds; (5) Humana threatened physicians and lawmakers who challenged its practices; and (6) Humana Insurance improperly tied use of its insurance policy with treatment at Sunrise. Errata (# 822) at 283–290.

Finally, with regard to the antitrust injury suffered by the Antitrust Class, Plaintiffs allege that, as a result of Defendants' monopolistic activity, its members were forced to pay excessive co-payments and insurance premiums. Errata (# 822) at 276–77, 308–311.

### B. *Discussion*

#### 1. Elements of a Section 2 Claim

In order to prevail on a claim of monopolization under Section 2 of the Sherman Act, a plaintiff must demonstrate: (1) possession of monopoly power in the relevant market; (2) willful acquisition or maintenance of that power; and (3) causal antitrust injury. *Oahu Gas Service, Inc. v. Pacific Resources, Inc.*, 838 F.2d 360, 363 (9th Cir.

1988), *cert. denied,* 488 U.S. 870, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988).

To establish a Section 2 claim for an attempt to monopolize, a plaintiff must demonstrate four elements: (1) specific intent to control prices or destroy competition; (2) predatory or anti-competitive conduct directed toward accomplishing that purpose; (3) a dangerous probability of success; and (4) causal antitrust injury. *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 811 (9th Cir. 1988).

Both market definition and market power are essentially questions of fact, whereas questions of whether specific conduct is anti-competitive or whether a party has standing to assert a violation of the Sherman Act are questions of law. *Austin v. Blue Cross and Blue Shield of Alabama,* 903 F.2d 1385, 1387 (11th Cir.1990); *Oahu,* 838 F.2d at 363, 368.

#### 2. The Need for Market Analysis

As an initial matter, Plaintiffs argue that they need not formally define a "relevant market," as Humana and Humana Insurance made "supracompetitive profits" during the relevant time period, and that this alone adequately demonstrates market power. Errata (# 822) at 278–283. Such an argument is without merit.

First, by definition, any allegation that Defendants made "excessive" profits necessarily requires that Plaintiffs compare the profit performance of Humana with that of its competitors. See Kintner, *Federal Antitrust Law,* § 12.10, at 361 (1980). To argue, as Plaintiffs do, that Defendants' profits were "excessive" without knowing what the relevant market was or who its competitors were renders any antitrust analysis vacuous.

Second, although prior Ninth Circuit law has held that a detailed market analysis is not uniformly fatal to a claim under the Sherman Act, in order to avoid such an analysis a plaintiff must be able to demonstrate that the anti-competitive acts alleged actually resulted in detrimental effects on competi-

---

when Nevada's cost containment statute was in place, Sunrise's operating margin was excessive compared to other hospitals nationally.

Errata (# 822) at 278–81.

16. The only evidence that Plaintiffs submit in support of this allegation of market share is a December 7, 1984 memo which states that "non-Humana usage was 19%" for Humana insurance insureds. Errata (# 822) at 305; Exhibit 132.

tion. *Bhan v. NME Hosp., Inc.*, 929 F.2d 1404, 1413 (9th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 617, 116 L.Ed.2d 639 (1991); *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1489 n. 3 (9th Cir.1991); *Thurman Industries, Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1373 (9th Cir.1989); *Oltz v. St. Peter's Community Hospital,* 861 F.2d 1440, 1448 (9th Cir.1988) (no need for detailed market analysis where evidence clearly demonstrated competitive harm to patient market in Helena through increase of price and decrease in competition for anesthesiological services). In the present case, Plaintiffs rely on conclusory allegations that Defendants made excessive profits and do not explain how these profits have resulted from anti-competitive conduct. See Errata (# 822) at 278–83. Such allegations clearly do not demonstrate a definable market or demonstrate market power which would obviate the need of a proper market analysis.[17]

Finally, even though courts have allowed proof of excessive profits to be used as evidence of market power, such proof may be misleading and subject to various interpretations. See Kintner, § 12.10; Areeda & Turner, *Antitrust Law,* § 507–516 (1978). As such, citing excessive profits without a more detailed analysis of the meaning of such profits is unsatisfactory proof of market power. *Telerate Systems, Inc. v. Caro,* 689 F.Supp. 221, 238 (S.D.N.Y.1988).

Accordingly, since allegations of Defendants' "excessive" profits do not clearly demonstrate market power or detrimental effects on competition, Plaintiffs still have the burden of proving that Defendants exercised monopoly power within the boundaries of a properly defined competitive market.

### 3. Defining the Relevant Market

■ Under Section 2, "defining the relevant market is indispensable to a monopolization claim." *Thurman Industries, Inc.,* 875 F.2d at 1373. A market is typically defined as the pool of goods or services that qualify as economic substitutes because they enjoy reasonable interchangeability of use and cross-elasticity of demand. *Morgan,* 924 F.2d at 1489; *Thurman,* 875 F.2d at 1373. The determination of a market usually requires an inquiry into the nature of the product and the geographic areas of effective competition. *Oahu,* 838 F.2d at 364. "For antitrust purposes, defining the product market involves the identification of the field of competition; the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business," while "a geographic market is an area of effective competition where buyers can turn for alternate sources of supply." *Morgan,* 924 F.2d at 1489–90; *see also Bhan,* 669 F.Supp. 998, 1018–19 (E.D.Cal.1987), *affirmed,* 929 F.2d 1404 (9th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 617, 116 L.Ed.2d 639 (1991) (another consideration in defining product market may be production dimension which is the ability of competing firms to easily supply a good or service if one firm limits its output). Finally, the plaintiff has the burden of proving the scope of the relevant market. *Id.* at 1019.

### 4. Plaintiffs' Relevant Markets

Plaintiffs offer two distinct markets which they contend Defendants monopolized or attempted to monopolize. These include: (1) those hospitals used by Humana Insurance insureds; and (2) all major for-profit acute care hospitals in Clark County, Nevada. Errata (# 822) at 290–292. Plaintiffs, however, fail to present sufficient evidence to support these market definitions.

#### a. *Hospitals Used by Humana Insurance Insureds*

■ With regard to those hospitals used by Humana Insurance insureds, Plaintiffs offer no facts to support such a market definition other than to refer to a recent United

---

17. This Court also recognizes that the Ninth Circuit's decisions on this point have been called into doubt by the United States Supreme Court's recent decision, *Spectrum Sports, Inc. v. McQuillan,* —— U.S. ——, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). *Spectrum Sports* held that an inquiry into market definition and market power is a prerequisite for a claim of attempted monopolization under § 2 of the Sherman Act. *Id.* at ——, 113 S.Ct. at 891–92. Even without regard to *Spectrum Sports,* however, it is clear that Plaintiffs have not satisfied Ninth Circuit precedent which limits the necessity of a market analysis.

States Supreme Court decision *Eastman Kodak Co. v. Image Technical Services,* — U.S. ——, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), and conclude that the hospitals used by Humana Insurance insureds should be considered a relevant submarket. Errata (# 822) at 291–292; 304–305. Providing no factual or legal basis for such a submarket, Defendants are entitled to summary judgment on this aspect of Plaintiffs' Section 2 claims. *See Seidenstein v. National Medical Enterprises, Inc.,* 769 F.2d 1100, 1106 (5th Cir.1985); *Drs. Steuer & Latham v. Nat. Med. Enterprises,* 672 F.Supp. 1489, 1514 (D.S.C.1987).[18]

b. *Major For–Profit Acute Care Hospitals*

■ The second market which Plaintiffs maintain Defendants monopolized or attempted to monopolize is that of major for-profit acute care hospitals in Clark County. This market allegedly consists of three hospitals, including Sunrise, Valley Hospital ("Valley"), and Desert Springs Hospital ("Desert Springs"), and excludes Clark County's five remaining acute care hospitals, Boulder City Hospital ("Boulder City"), Community Hospital of North Las Vegas ("Community"), St. Rose De Lima Hospital ("St. Rose"), University Medical Center ("UMC"), and Women's Hospital ("Women's"). Errata (# 822) at 291. In support of this market definition, Plaintiffs assert the following facts:

(1) Only Sunrise, Valley, Desert Springs, and University Medical Center ("UMC") have a comparable range of hospital services;

(2) Humana Insurance contracted with Boulder City, Community, and St. Rose to be preferred providers in its insurance program;

(3) Donald Stewart, Executive Director of Sunrise, when testifying before the Nevada Senate, stated that the smaller primary care hospitals in Clark County do not compete against the large hospitals;[19]

(4) UMC did not compete in the same market since it charged lower prices for its services and, being a non-profit county hospital, was perceived to be the "indigent" hospital in Clark County;[20]

Errata (# 822) at 290–305.

In analyzing Plaintiffs' second alleged market, the primary issue to be decided is

---

**18.** Even if this Court were to accept the argument that the hospitals used by Humana Insurance insureds could constitute a relevant submarket, Plaintiffs fail to address: (1) the fact that Humana insureds were able to (and did) easily switch health insurance policies; (2) the fact that under the Humana policy, Plaintiffs were not precluded from choosing hospitals other than Sunrise; and (3) what other hospitals were competing within this market. See Reply (# 841) at 72–75. Failure to address these facts clearly precludes finding the existence of Plaintiffs' proposed submarket.

Further, to the extent Plaintiffs rely on the *Kodak* decision to support a claim for an illegal tying arrangement between Humana and Humana Insurance, such a claim is without merit as the undisputed facts indicate that Humana Insurance never possessed sufficient market share to exercise market power within the group health insurance market. See Reply (# 841), Exhibit N, Supplemental Affidavit of Barry C. Harris at 16–22 (Humana Insurance's share of Clark County residents covered by commercial health insurance was the following—1984/4%, 1985/18%, 1986/24%, 1987/17%, 1988/15%); *Barry v. Blue Cross of California,* 805 F.2d 866, 870–74 (9th Cir.1986); *Ezpeleta v. Sisters of Mercy Health Corp.,* 800 F.2d 119, 121–122 (7th Cir.1986).

**19.** More specifically, on May 20, 1987, Donald Stewart testified:

Large, full service hospitals with the latest in medical technology compete vigorously against each other for market share. However, smaller primary care hospitals, charging less and not providing as specialized or technical care have found a niche in the market. For the most part, the larger hospitals do not compete against them.

That will change with this bill. By forcing a rollback of our billed charges and a deep reduction in revenue per admission, the state will prevent us from being the kind of hospital we want to be, and force us and other large hospitals into markets we currently avoid.

If you limit our prices and our revenue per admission, the only response left to us in the market is to increase our volume. This will require expanding into markets we don't currently pursue and competing directly for the segments of the market that are the mainstay of smaller hospitals.... The marketplace is dynamic and changing. You cannot change that by legislation.

See Errata (# 822), Exhibit 125, at 7–8.

**20.** Plaintiffs also allege that physicians who practiced at Valley often did not admit its patients to UMC. See Errata (# 822) at 299. Even if this fact is true, this Court fails to see how it helps to establish that UMC and Sunrise were not competitors.

whether Plaintiffs have presented sufficient evidence to support their allegation that the relevant service market for antitrust purposes consists of Clark County's major for-profit acute care hospitals.[21] This Court finds that Plaintiffs have failed to do so.

Plaintiffs' assertion that Boulder City, Community, St. Rose, and Women's are not competitors of Sunrise because they do not offer a comparable range of hospital services misconstrues the alleged injury in this case. Although this Court would agree with the proposition that certain hospital services under certain facts may constitute a relevant submarket,[22] throughout this litigation Plaintiffs have not claimed or offered any evidence regarding the monopolization of specific hospital services such as open heart surgery or renal dialysis, etc. See Errata (# 822) at 297. The antitrust injury alleged by Plaintiffs in this case is the actual or attempted monopolization of the general acute care hospital market in Clark County. See Errata (# 822) at 313–315. Given that Boulder City, Community, St. Rose, and Women's all offer a variety of hospital services within this market, these hospitals have the ability to deprive Sunrise of significant levels of business and therefore, must be considered to be competitors of Sunrise. See Reply (# 841) at 99–105; Errata (# 822) at 296–97; *Morgan,* 924 F.2d at 1489 (competitors are "the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business");

*Thurman,* 875 F.2d at 1374–1377 (specialty stores selling same products as more comprehensive home centers within same competitive market); *see also United States v. Rockford Memorial Corp.,* 898 F.2d 1278, 1284 (7th Cir.1990), *cert. denied,* 498 U.S. 920, 111 S.Ct. 295, 112 L.Ed.2d 249 (1990); *Weiss v. York Hosp.,* 745 F.2d 786, 826 (3rd Cir.1984), *cert. denied,* 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985); *United States v. Carilion Health System,* 707 F.Supp. 840, 847 (W.D.Va.1989), *aff'd,* 892 F.2d 1042 (4th Cir.1990).

Plaintiffs further allege that Boulder City, Community, and St. Rose are not competitors of Sunrise because these three hospitals are also preferred providers under the Humana insurance policy. Although it is true that to Humana Insurance insureds, having preferred provider status at Boulder City, Community, and St. Rose made these hospitals more competitive with Sunrise and with each other, the simple fact remains that the acute care hospital service market in Clark County does not serve only Humana Insurance insureds. See *supra* at n. 18 (Humana Insurance's percentage of Clark County residents with medical insurance was 15% to 24% during relevant time period). Accordingly, because these institutions competed for patients independent of any relationship which they might have had with Humana Insurance, any argument raised by Plaintiffs that these hospitals did not compete in the same market as Sunrise must be rejected.[23]

21. There is really no dispute as to the geographic market in this case. As established by Defendants' experts, the consumers in the market in which Sunrise competes regularly seek care at hospitals throughout Clark County. See Motion for Summary Judgement (# 804) at 64–72; Reply (# 841) Exhibit N, Supplemental Affidavit of Barry Harris, at 6–8, 13–14; Exhibit Z, Supplemental Affidavit of Harold M. Ting, at 21. Although Plaintiffs raise the point that UMC may be in a different geographic area than Sunrise, such an assertion is easily refuted by the analysis presented by Defendants' experts, the fact that UMC is only 3 miles away from Sunrise, and the fact that Valley Hospital, which Plaintiffs assert is a competitor of Sunrise, is in the same "western" location and is further from Sunrise than UMC. See *id.;* Reply (# 841), Exhibit N, Supplemental Affidavit of Harold M. Ting, at Exhibit 4.

22. *See, e.g., Morgan,* 924 F.2d at 1488–89 (radiology services constitute relevant market); *Oltz,*

861 F.2d at 1446–48 (patient anesthesiological services constitute relevant market).

23. Plaintiffs also rely on the affidavit of Victor Brewer and the testimony of Donald Stewart to support their argument that the smaller hospitals did not compete in the same market as Sunrise. With regard to Victor Brewer's affidavit, except for his statement regarding physician overlap between Community and Sunrise, the statements contained therein are conclusory allegations insufficient to raise a question of material fact. See Errata (# 822), Exhibit 112. As to Donald Stewart's testimony, apart from being in the context of trying to sway the Nevada legislature from further regulating the hospital industry, the clear gravamen of these statements was that even though the larger hospitals in Clark County participated in the same marketplace as the smaller hospitals, they chose not to focus their marketing resources on pursuing this share of the market.

Finally, Plaintiffs argue that UMC should not be considered a competitor of Sunrise because UMC charged lower prices than other hospitals, and because it is a non-profit county hospital, UMC was perceived to be the "indigent" hospital. This Court finds such arguments unpersuasive.

First, the facts in this case reveal that during the relevant time period UMC offered a wide range of acute care hospital services and had contracts for these services with nearly all managed care plans in Nevada. See Motion for Summary Judgment (# 804) at 74–76; Exhibit # 120; Exhibit # 122; Exhibit # 123; Exhibit # 125 at 51–60. In addition, UMC competed with Sunrise for beds under Certificate of Need applications, attempted to recruit doctors from other Las Vegas hospitals, upgraded its facilities and equipment, and advertised to improve its public image. *Id.* at 77–78; Exhibit # 122; Exhibit # 125 at 60–62; Exhibit # 129; Exhibit # 131; Exhibit # 133; see also Supplemental Affidavit of Harold M. Ting (# 842), Exhibit 8 (UMC's 1989–1990 marketing plan which identifies Sunrise as a competitor). Such factors clearly demonstrate that UMC was a significant competitor for patients in Clark County's acute care hospital market.

With regard to Plaintiffs' pricing argument, as the Ninth Circuit has recognized before, "the scope of the relevant market is not governed ·by the presence of a price differential between competing products." *Twin City Sportserv., Inc. v. Charles O. Finley & Co.,* 512 F.2d 1264, 1274 (9th Cir.1975). This is particularly so where, as here, the pricing for hospital services commonly is subject to discounting through third-party payors, and where other factors such as location, physician affiliation, and the perceived quality of the institution are more likely to affect competition than price. See Motion for Summary Judgment (# 804), Exhibit # 8, Affidavit of Harold M. Ting at 9; Exhibit # 120, at 17. Although it is no doubt true that being perceived as an "indigent hospital" negatively affected UMC's ability to attract commercial-ly-insured patients, the facts also clearly demonstrate that this did not deter UMC from actively pursuing and providing services to them. See *supra* at 34–35; Reply (# 841), Supplemental Affidavit of Barry C. Harris, Exhibit N, at 14–16; Supplemental Affidavit of Harold M. Ting, Exhibit Z, at 17–21; see also *United States v. Rockford Memorial Corp.,* 717 F.Supp. 1251, 1284–85 (N.D.Ill. 1990); *Nonprofit Hospital Mergers: Proceed With Caution,* 20 Cumb.L.Rev. 719, 720–28 (1989–90) (describing generally the market forces which cause nonprofit hospitals to compete with for-profit hospitals). To argue that UMC, the second largest acute care hospital in Clark County, was entirely removed from the competitive market for hospital services because it was perceived by some as a "county hospital" which also served indigent patients simply ignores the competitive reality of the Clark County hospital market.

This Court concludes that, based on the record in this case, the Antitrust Class has failed to properly establish either of its proposed submarkets. To the extent a relevant competitive market is defined by the parties, this market would be the general acute care hospital service market in Clark County consisting of Boulder City, Community, Desert Springs, St. Rose, Sunrise, UMC, Valley, and Women's hospitals.

### 5. Monopoly Power Within the Relevant Market

■ Once a relevant market is established, the inquiry shifts to whether the alleged monopolist exercised or had the potential to exercise market power. Although no single factor has been held determinative, the evaluation of market power usually depends on an evaluation of market share and barriers to entry. See *Oahu,* 838 F.2d at 366. A helpful framework for evaluating market share which has been used repeatedly by courts was articulated by Judge Learned Hand in *United States v. Alum. Co. of America,* 148 F.2d 416, 424 (2d Cir.1945), where he found that a ninety percent market

See *supra* at n. 19. Furthermore, to the extent that Stewart's statements could be inferred to support Plaintiffs' conclusion that Sunrise did not seek to compete vigorously against the smaller hospitals in Clark County, this statement alone does not raise a material question of fact with regard to whether these smaller hospitals acted as a competitive constraint on the same general acute care hospital services offered by the larger hospitals.

share is enough to constitute a monopoly, a sixty percent market share is doubtful, and "certainly thirty-three percent is not." *Id.; Syufy Enterprises v. American Multicinema, Inc.,* 793 F.2d 990, 995 (9th Cir.1986), *cert. denied,* 479 U.S. 1031, 1034, 107 S.Ct. 876, 884, 93 L.Ed.2d 830, 838 (1987); *Rebel Oil Co., v. Atlantic Richfield Co.,* 808 F.Supp. 1464, 1468 (D.Nev.1992); *see also Barry,* 805 F.2d at 874; Areeda & Turner, *Antitrust Law,* § 518.3 at 522–523 (1991 Supp.). In addition, declining market share may reflect the absence of market power. Output as opposed to capacity is a more accurate measure of market share, and excess capacity, if it can be reasonably be determined, may limit the exercise of market power. *Oahu,* 838 F.2d at 366; *Carilion,* 707 F.Supp. at 848–49; Areeda & Turner, *Antitrust Law,* §§ 520(a), 521(e) (1991 Supp.).

In determining the market share of hospitals, facts that need to be examined include the percentage shares of patient days and admissions of the various competitors. Facts which are relevant to hospital capacity include the number of licensed beds within the hospitals as well as their respective occupancy percentages. An examination of these facts in the present case reveal the following:

(1) Patient Days—Sunrise's market share of Clark County hospital patients in terms of patient days was 35% in 1985, 33% in 1986, 32% in 1987, and 32% in 1988; [24]

(2) Admissions—Sunrise's market share of Clark County hospital patients in terms of admissions was 34% in 1985, 32% in 1986, 30% in 1987, and 30% in 1988; [25]

(3) Number of Licensed Beds—Sunrise's percentage of licensed beds in Clark County was 36% in 1985, 35% in 1986, 35% in 1987, and 35% in 1988; [26]

(4) Occupancy Percentage—Sunrise's capacity utilization of all beds was 52% in 1985, 48% in 1986, 52% in 1987, and 53% in 1988 compared to a Clark County average utilization rate of 53% in 1985, 44% in 1986, 56% in 1987, and 58% in 1988.[27]

As can be seen from the above figures, throughout the relevant time period, Sunrise had approximately one third of the Clark County market for acute care hospital services. Although it is true that at the time in question, Nevada's Certificate of Need requirements acted as a potential entry barrier to new participants, the evidence also demonstrates that during the relevant time period there was substantial excess bed capacity at existing hospitals. This excess capacity would temper any competitive advantage Sunrise might have realized from such regulations.[28]

Accordingly, this Court further finds that Plaintiffs have failed to establish that Defendants had the ability to exercise monopoly power within Clark County's acute care hospital market during the relevant time period. *See Thurman,* 875 F.2d, at 1377–80; *Barry,* 805 F.2d at 874; *Bhan,* 669 F.Supp. at 1022–23.[29]

**24.** See Motion for Summary Judgement (# 804), Exhibit 7, Affidavit of Barry C. Harris at Exhibit 2a; Reply (# 841), Supplemental Affidavit of Barry C. Harris at Exhibit 1.

**25.** *Id.*

**26.** Reply (# 841), Supplemental Affidavit of Barry C. Harris at Exhibit 1.

**27.** See Motion for Summary Judgement (# 804), Exhibit 7, Affidavit of Barry C. Harris at Exhibit 4. Also included in this exhibit are the individual utilization rates of the various individual hospitals in Clark County. These rates are approximately 40% to 60% during the relevant time period.

**28.** In fact, an argument could be made that the Nevada's Certificate of Need requirements actually injured Sunrise's competitive position since of the 245 additional beds which were licensed between 1979 and 1988, only 16 of these were given to Sunrise. See Reply (# 242), Supplemental Affidavit of Harold M. Ting, Exhibit Z, at Exhibit 5.

**29.** Even if this Court were to assume that the smaller hospitals in Clark County were not within the same competitive market as Sunrise, such a fact does not alter the conclusion that Sunrise did not have sufficient market share within Clark County to exercise market power during the relevant time period. Using only Desert Springs, Sunrise, Valley, and UMC as the competitive market, in total patient days Humana had market shares of 40% in 1985, 38% in 1986, 36% in 1987, and 36% in 1988 and in admissions Humana had market shares of 38% in 1985, 39% in 1986, 36% in 1987, and 35% in 1988. See Opposition (# 820), Exhibit 107 (data relating to inpatient days and admissions for Desert Springs, Sunrise, Valley, and UMC).

### 6. Antitrust Injury

■■■ Finally, even if this Court could find that Plaintiffs have adequately defined a relevant competitive market and have shown Defendants monopolized or attempted to monopolize that market, this Court would nevertheless have to conclude that Plaintiffs have not adequately demonstrated antitrust injury. Although Plaintiffs claim that they have suffered antitrust injury as a result of paying excessive premiums and/or co-payments, such monetary losses relate, if at all, to Defendant Humana Insurance's allegedly erroneous interpretation of the health insurance contract, and not the alleged anti-competitive acts of Sunrise (e.g. the diversion of critical care patients and refusal to unbundle level III neonatal services). This, coupled with the fact that Plaintiffs were only indirect purchasers of hospital services whose premiums and co-payments were undoubtedly subject to a number of other influences (e.g. competition in the health insurance market, state regulation, etc.) external to the cost of hospital services, clearly demonstrates that Plaintiffs' Antitrust Class has not suffered "antitrust injury." *Cf. Austin*, 903 F.2d at 1390–93.

### C. *Conclusion*

In light of Plaintiffs' failure to adequately demonstrate the alleged submarkets, the fact that Defendants could not exercise market power, and the failure of Plaintiffs to demonstrate antitrust injury, Defendants are entitled to summary judgment on Plaintiffs' Second Claim for Relief.

## IV. RICO

### A. *Overview*

The Third and final Claim for Relief alleged by Plaintiffs in their Second Amended Complaint is a violation of RICO pursuant to 18 U.S.C. § 1964(c) brought by Plaintiffs Co-Payor Class and Premium Payor Class. In support of this claim, both classes of Plaintiffs assert that during 1985 to 1988: (1) Humana and Humana Insurance acted as members of an "association in fact" enterprise or, alternatively, that Humana, a person within the meaning of 18 U.S.C. § 1964(3), associated with Humana Insurance, an enterprise within the meaning of 18 U.S.C. § 1961(4); (2) that Humana and Humana insurance entered into a secret agreement to discount amounts owed by Humana Insurance for hospital charges incurred by Humana Insurance insureds; (3) Humana and Humana Insurance concealed and/or misrepresented this agreement to Plaintiffs in the numerous mailings, telephone calls, and television/radio advertisements; and (4) that such acts (a) were intended to and did induce the Premium Payor Class into buying policies they would not have otherwise purchased, and (b) defrauded the Co–Payor Class into paying excessive co-payments. Second Amended Complaint (# 370) at 18, 22–23; Errata (# 822) at 103–109, 221–223, 251–253.

In support of their Motion for Summary Judgment (# 804), Defendants Humana and Humana Insurance assert the following arguments:

(1) Plaintiffs cannot prove that the alleged misrepresentations and/or omissions of Defendants were intended to defraud them since (a) it is undisputed that the Humana Insurance policy mirrored other health plans in place during the relevant time period and, (b) the discount arrangement was disclosed to Nevada regulators. Motion for Summary Judgment (# 804) at 98–116;

(2) New precedent requires this Court to reverse its prior ruling that Humana is a "person" distinct from Humana Insurance, the "enterprise," under 18 U.S.C. § 1962(c). Motion for Summary Judgment (# 804) at 131–136;

(3) The Premium Payor Class cannot show that they suffered RICO injuries, or even assuming they could, that these injuries were proximately caused by Defendants' actions. Motion for Summary Judgment (# 804) at 116–126;

(4) Under RICO, the only damages which the Co–Payor Class is entitled to recover is the amount of excess co-payments which the class paid as a result of Defendants' allegedly improper interpretation of the policy. Motion for Summary Judgment (# 804) at 126–131;

(5) The McCarran–Ferguson Act Precludes Plaintiffs' RICO cause of action. Motion for Summary Judgment (# 804) at 136–146.

## B. *Requirements of RICO, 18 U.S.C. § 1962(c)*

■ Liability pursuant to 18 U.S.C. § 1962(c) requires a Plaintiff to demonstrate (1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sun Savings and Loan Assoc. v. Dierdorff,* 825 F.2d 187, 191 (9th Cir.1987). "Racketeering activity" is any act indictable under various provisions of Title 18 of the United States Code, *see* 18 U.S.C. § 1961, and includes the predicate acts alleged in this case of mail fraud and wire fraud pursuant to 18 U.S.C. §§ 1341, 1343. *Id.*

In order to commit mail fraud under § 1341, Plaintiffs must demonstrate that: "(1) the defendants formed a scheme or artifice to defraud: (2) the defendants used the United States mails or caused a use of the United States mails in furtherance of the scheme; and (3) the defendants did so with the specific intent to deceive or defraud." *Schreiber Distributing v. Serv–Well Furniture Co.,* 806 F.2d 1393, 1400 (9th Cir.1986). Similarly, in order to commit wire fraud pursuant to § 1343, Plaintiffs must show: "(1) the formation of a scheme or artifice to defraud; (2) the use of the United States wires or causing a use of the United States wires in furtherance of the scheme; and (3) specific intent to deceive or defraud." *Id.*

■ Under these provisions, fraud refers to " '(1) a false representation (2) in reference to a material fact (3) made with knowledge of its falsity (4) and with the intent to deceive.' " *United States v. Bonallo,* 858 F.2d 1427, 1433 (9th Cir.1988). A failure to disclose or concealment may also serve a basis for a fraudulent scheme under mail and wire fraud statutes; however, such nondisclosure must arise from a failure to comply with an independent statutory or fiduciary duty. *California Arch. Bldg. Prod. v. Franciscan Ceramics,* 818 F.2d 1466, 1472 (9th Cir.1987), *cert. denied,* 484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988); *United States v. Dowling,* 739 F.2d 1445, 1449 (9th Cir.1984), *rev'd on other grounds,* 473 U.S. 207, 105 S.Ct. 3127, 87 L.Ed.2d 152 (1985).

## C. *Plaintiffs' Failure to Demonstrate Intent to Defraud*

■ The first argument raised by Defendants in support of their Motion for Summary Judgment (# 804) on Plaintiffs' RICO claims is that there is no evidence to suggest that Defendants had "specific intent to deceive or defraud" the Plaintiffs. More specifically, Defendants contend that insofar as the development of the policy in question is concerned:

(1) during the period in question, the health care industry was just beginning to experiment with preferred provider arrangements, and no industry standards were in place governing how co-payment discounts should be administered; (2) that the policy in question was simply modeled after one developed and already in place in Florida; (3) Medicare employs an analogous system for the payment of co-payments; (4) confidentiality clauses were common in the industry for such discount arrangements to ensure the protection of proprietary information; and (5) that only 9.54% of all Humana Insurance insureds resulted in paying higher co-payments if the discount given Humana Insurance would have been shared.

Motion for Summary Judgment (# 804) at 99–108.

Defendants further assert that various parties other than Defendants were aware of the co-payment arrangement, that Defendants disclosed the discount arrangement to Nevada regulators at various times between 1984 and 1986, and that on June 6, 1986, while at hearings before the Nevada Department of Insurance ("DOI"), Defendants directly informed DOI officials that bills issued to insureds did not reflect any discounts received by Humana Insurance from Humana. Motion for Summary Judgment (# 804) at 110–116.

Plaintiffs respond that notwithstanding any disclosures made by Defendants to third parties, Defendants failed to disclose the co-payment scheme to Plaintiffs directly, and

even had attempted to conceal it. According to Plaintiffs, Defendants' Motion for Summary Judgment (# 804) raises a material question of fact regarding whether Defendants had the requisite "intent" required under the mail and wire fraud statutes. See Errata (# 822) at 1–46, 219–221.

 In determining whether Defendants satisfy the "intent" requirement of the mail and wire fraud statutes, Plaintiffs must demonstrate that the fraud was active and not merely constructive. *United States v. Bohonus*, 628 F.2d 1167, 1172 (9th Cir.1980), *cert. denied*, 447 U.S. 928, 100 S.Ct. 3026, 65 L.Ed.2d 1122 (1980). Specific intent may be shown by examining the scheme to determine whether it "was reasonably calculated to deceive persons of ordinary prudence and comprehension." *Sun Savings*, 825 F.2d at 196; *Schreiber*, 806 F.2d at 1400; *Bohonus*, 628 F.2d at 1172; *see also United States v. Green*, 745 F.2d 1205, 1209 (9th Cir.1984), *cert. denied*, 474 U.S. 925, 106 S.Ct. 259, 88 L.Ed.2d 266 (1985) (specific intent to defraud means to deceive or mislead, and does not include situations where act involved was the result of ignorance, mistake, or accident).

Notwithstanding the facts asserted by Defendants, viewing all inferences in favor of Plaintiffs as this Court must do, it is clear that a material question of fact exists as to whether Defendants' interpretation of the co-payment provision, which was furthered through the use of United States mails or wires, was specifically intended to mislead or deceive Plaintiffs or whether it was the result of ignorance, mistake, or accident. Accordingly, Defendants Motion for Summary Judgment (# 804) on this ground must be denied.

### D. *Person/Enterprise Distinction*

 Plaintiffs next allege that Humana and Humana Insurance acted as members of an "association in fact" enterprise or, alternatively, that Humana, a person within the meaning of 18 U.S.C. § 1964(3), associated

with Humana Insurance, an enterprise within the meaning of 18 U.S.C. § 1961(4), to defraud Plaintiffs. As this Court recognized in its July 9, 1991 Order (# 364), such allegations satisfy the "person/enterprise" requirements of 18 U.S.C. § 1962(c). *See River City Markets v. Fleming Foods West*, 960 F.2d 1458, 1460–62 (9th Cir.1992); *U.S. v. Feldman*, 853 F.2d 648, 656–59 (9th Cir. 1988), *cert. denied*, 489 U.S. 1030, 109 S.Ct. 1164, 103 L.Ed.2d 222 (1989); *cf. Glessner v. Kenny*, 952 F.2d 702, 710–14 (3rd Cir.1991). Accordingly, Defendants are not entitled to summary judgment on this ground.

### E. *RICO Damages for the Premium Payor Class*

 The third argument asserted by Defendants in support of summary judgment is that the Premium Payor Class has not demonstrated the requisite causal nexus between the RICO damages they seek and the fraud alleged as a predicate act. This Court agrees.

At the outset, the Premium Payor Class notes that the nondisclosure of the discounting arrangement between Humana and Humana Insurance induced its members into obtaining Humana Insurance policies. Errata (# 822) at 221–222. The Premium Payor Class then asserts that numerous television and direct mail advertisements promised that employers and employees would "share in reduced hospital costs through premium reductions." Errata (# 822) at 104, 222, 235.[30] The damages which the Premium Payor Class contend they have suffered as a result of these actions is "the difference in the actual price of the insurance product that they purchased (the premiums actually paid) and what the premiums should have been if premiums were calculated to include the discounts that Humana Insurance was receiving." Errata (# 822) at 222.

---

**30.** The language from the advertisements to which the Premium Payor Class refer is as follows:

(1) "Tap Dance" commercial: "Because we can control costs, both you and your company can save a great deal of money without the song and dance;"

(2) "Mumbo Jumbo" commercial: "We can save you and your company money without insurance mumbo jumbo;"

(3) "Cuts" commercial: "Humana is a hospital company, so we can control costs, saving employers and employees money."

Errata (# 822) at 33; Reply (# 841) at 35.

In *Imagineering, Inc. v. Kiewit Pacific Co.*, 976 F.2d 1303 (9th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1644, 123 L.Ed.2d 266 (1993), the Ninth Circuit clarified the requirements of proximate causation and recoverable damages under RICO. With respect to the issue of proximate causation, the Court in *Imagineering* stated:

> In order to maintain a cause under RICO then, the plaintiff must show not only that the defendant's violation was a "but for" cause of his injury, but that it was the proximate cause as well. This requires that there must be a direct relationship between the injury asserted and the injurious conduct alleged.... One principle underlying this requirement is that the less direct the injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent factors.

*Id.* at 1311, citing *Holmes v. Securities Investor Protection Corp.*, —— U.S. ——, ——, 112 S.Ct. 1311, 1317–18, 117 L.Ed.2d 532 (1992).

Consistent with this view of proximate cause, the Court in *Imagineering* held that not all injuries are compensable under RICO, but rather only those which are proven by a "concrete financial loss." *Id.* at ——, 112 S.Ct. at 1310; *see also Oscar v. University Students Co-opeative Ass'n*, 965 F.2d 783, 785 (9th Cir.1992) (*en banc*), *cert. denied*, —— U.S. ——, 113 S.Ct. 655, 121 L.Ed.2d 581 (1992).

The claim by the Premium Payor Class that Humana Insurance's advertising campaign misrepresented that its members would "share in reduced hospital costs through premium reductions," is without merit. The advertisements to which Plaintiffs refer are nothing more than puffery and plainly do not contain any representations which would indicate how insurance premiums would be calculated. As such, this alleged predicate act cannot be viewed as the proximate cause of the Premium Payor Class' asserted RICO injury. *See, e.g., Berent v. Kemper Corp.*, 973 F.2d 1291, 1295–96 (6th Cir.1992).

The Premium Payor Class also argues that had its members known how Humana Insurance would calculate co-payments under its policy, they would not have purchased Humana polices. This argument is problematic for several reasons.

First, as stated by Defendants, the logical injury which would follow from a "fraudulent inducement" would be that the Premium Payor Class could have obtained comparable policies elsewhere for less and instead chose Humana as their insurance carrier. See Reply (# 841) at 36–37. Plaintiffs do not present any evidence in this regard. See Errata (# 822) at 227–236.

Plaintiffs argue instead that they did not get the benefit of what they bargained for: an insurance policy under which co-payments would be calculated with consideration of any hospital discounts received. See Errata (# 822) at 224. Plaintiffs may be correct, although there is no evidence in the record to demonstrate that they are. Unlike the Co-Payor Class, however, the members of the Premium Payor Class never incurred a hospital bill or made a co-payment. Its members simply paid the premiums they had previously agreed to pay assuming that any hospital discounts obtained by Humana Insurance would be reflected in their co-payment determinations. Accordingly, even though it is clear that the members of the Premium Payor class could have *potentially* been defrauded by Defendants' calculation of co-payments, under the undisputed facts, no such injury actually occurred.

Plaintiffs' additional argument that their "injury" arose from the fact that Sunrise's discount to Humana Insurance should have been included in calculating their initial premiums must be rejected for two reasons. First, although this argument enables Plaintiffs to state a more direct injury, it completely ignores the fact that the fraud which supposedly induced Plaintiffs to purchase the Humana policy involved representations about how co-payments were to be determined. Nothing in the record suggests that the Defendants fraudulently represented how

they would calculate premiums.[31] Even if Humana Insurance did err in its calculation of the initial premiums, this error was independent of the predicate acts which Plaintiffs have alleged throughout this litigation.

Second, Plaintiffs' argument ignores other factors, such as the price of competing insurance products, that were used to determine the price of premiums paid by the Premium Payor Class. See Errata (# 822) at 228. Assuming that simply deducting the cost of the discounts in Defendants' actuarial formula would lead to a fair market price that the Premium Payor Class would have paid for the Humana policy ignores the competitive realities of the group health insurance market.

Accordingly, given the failure of the Premium Payor Class to adequately demonstrate a "direct relationship between the injury asserted and the injurious conduct alleged" or a "concrete financial injury" for purposes of RICO, Defendants are entitled to summary judgment. *Imagineering*, 976 F.2d at 1311.

F. *RICO Damages for the Co–Payor Class*

■■■ This Court previously has analyzed how to calculate the damages incurred by the Co–Payor Class which would be causally connected to Defendants' alleged breach of fiduciary duties under ERISA. *See supra* at 1507–09. This Court finds that the reasoning of the Ninth Circuit in *Imagineering* and *Oscar* regarding the requirements of proximate cause and concrete financial injury applies with equal force in the context of damages available under RICO. Accordingly, Defendants are entitled to summary judgment on the Co–Payor Class' RICO claim to the extent that the Co–Payor Class seeks damages in excess of the amount that they could have recovered under a proper interpretation of the co-payment provision.

G. *McCarran–Ferguson Act Exception*

■■■ Finally, Defendants argue that the McCarran–Ferguson Act precludes Plaintiffs from pursuing their RICO claim. This Court agrees.

Section § 1012(b) of the McCarran–Ferguson Act provides:

> No Act of Congress shall be construed to invalidate, impair or supersede any law enacted by any State for the purpose of regulating the business of insurance, . . . unless such Act specifically relates to the business of insurance . . . .

15 U.S.C. § 1012(b).

The purpose of this provision is to impose a clear-statement rule "that state laws enacted 'for the purpose of regulating the business of insurance' do not yield to conflicting federal statutes unless a federal statute specifically requires otherwise." *United States Dept. of the Treasury v. Fabe,* —— U.S. ——, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993) (citation omitted).

■■■ In order to determine if Section 2(b) precludes application of a particular federal statute, a court must apply the following four part test: (1) is the federal statute one which specifically relates to the business of insurance; (2) does the complained of activity constitute the business of insurance; (3) has the state enacted laws for the purpose of regulating the complained of activity; and (4) would the application of the federal statute invalidate, impair, or supersede the state legislation. *See LeDuc v. Kentucky Central Life Ins. Co.,* 814 F.Supp. 820, 826–27 (N.D.Cal.1992); *Thacker v. New York Life Ins. Co.,* 796 F.Supp. 1338, 1341 (E.D.Cal. 1992).

There can be no dispute that RICO does not specifically relate to the business of insurance. *See LeDuc,* 814 F.Supp. at 827; *Thacker,* 796 F.Supp. at 1341.

It is equally clear that Plaintiffs' complained of activities constitute the "business of insurance." The crux of the RICO claim brought by the Premium Payor Class is that nondisclosure of the discount arrangement between Humana and Humana Insurance in advertisements and other communications fraudulently induced its members into purchasing the Humana Insurance policies. See Second Amended Complaint (# 370) at 18–23.

---

**31.** Indeed, Plaintiffs indirectly acknowledge this point in their Opposition when they admit that their argument is not that "Defendants' fraud 'caused' Defendants to charge improper premiums." See Errata (# 822) at 224.

The gravamen of the RICO claim brought by the Co–Payor Class is that nondisclosure of the discount arrangement between Humana and Humana Insurance fraudulently induced its members into paying excessive co-payments. *Id.* Since these alleged acts directly relate to the purchase and execution of Humana Insurance policies, they fall squarely within the meaning of the "business of insurance." *See Fabe,* —— U.S. ——, 113 S.Ct. 2202 ("the actual performance of an insurance contract falls within 'the business of insurance' ... [t]o hold otherwise would be mere formalism."); *WEXCO, Inc. v. IMC, Inc.,* 820 F.Supp. 194 (M.D.Pa.1993); *LeDuc,* 814 F.Supp. at 828; *but see, Thacker,* 796 F.Supp. at 1342. Accordingly, Defendants also satisfy the second prong of the McCarran–Ferguson test.

In evaluating whether Nevada has enacted laws governing the activities complained of in Plaintiffs' RICO claims, it is not necessary that a state have a specific statute banning a particular practice. The inquiry is whether the state involved has adopted a regulatory scheme which possesses jurisdiction over the challenged activity. *See Feinstein v. Nettleship Co. of Los Angeles,* 714 F.2d 928, 933 (9th Cir.1983), *cert. denied,* 466 U.S. 972, 104 S.Ct. 2346, 80 L.Ed.2d 820 (1984); *WEXCO,* 820 F.Supp. at 197.

In 1971, Nevada adopted the Trade Practices and Frauds; Financing of Premiums Act ("Act"), N.R.S. § 686A.010, *et seq.* This Act was designed to regulate the business of insurance as recognized in the McCarran–Ferguson Act "by defining, or providing for the determination of, all such practices in this state which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined and determined." N.R.S. § 686A.010. Under this Act, Nevada recognized that the Commissioner of Insurance "has exclusive jurisdiction" in regulating the trade practices of the business of insurance. N.R.S. § 686A.015. Furthermore, the Act specifically prohibits the dissemination of false or misleading information relating to the sale of policies or the benefits obtained thereto, N.R.S. §§ 686A.030, 686A.040, and those violating the Act are subject to enforcement of its provisions by the Commissioner. N.R.S. §§ 680A.200, 686A.160, 686A.170, and 686A.310. These statutes and others requiring the approval of forms used by insurers, N.R.S. §§ 687B.120, 687B.130, clearly demonstrate an attempt by Nevada to regulate the conduct complained of in this case through the adoption of a comprehensive regulatory scheme.[32] Accordingly, this Court finds that the third prong of McCarran–Ferguson test is also satisfied. *See also WEXCO,* 820 F.Supp. at 197; *LeDuc,* 814 F.Supp. at 829; *Thacker,* 796 F.Supp. at 1341–42.

Finally, under the McCarran–Ferguson test, this Court must consider whether the application of RICO would invalidate, impair, or otherwise supersede Nevada legislation. As acknowledged by Plaintiffs in their Opposition (# 822), the Nevada Commissioner of Insurance, in enforcing the Act, can prohibit unfair trades practices, impose fines, and withdraw approval of insurance plans. See Opposition (# 822) at 270–274; N.R.S. §§ 686A.160, 686A.170, 686A.187, and 687B.130. As Plaintiffs contend, the State of Nevada does not proscribe the same harsh penalties which would be available under RICO (e.g. treble damages and attorney's fees) for Defendants' violation of unfair trade practices. See Errata (# 822) at 270–274. As recognized by the courts in *WEXCO* and *LeDuc,* however, this is the very reason why the fourth prong of the McCarran–Ferguson test is met. *See WEXCO,* 820 F.Supp. at 198; *LeDuc,* 814 F.Supp. at 829; *but see Thacker,* 796 F.Supp at 1343. For this Court to allow Plaintiffs to pursue the harsher RICO penalties for behavior which the Nevada Legislature apparently did not deem worthy of such penalties, would be tantamount to allowing Congress to intercede in an area expressly left to the states under the McCar-

---

**32.** In fact, Plaintiffs tacitly admit that Humana Insurance's fraudulent activity was covered by the existing Nevada statutory scheme when they argue that Humana Insurance "cavalierly ignored" these "general legal requirements," thus requiring the Nevada legislature to pass in 1987 the more rigorous requirements of sharing discounts under AB 289. See Opposition (# 822) at 271.

ran–Ferguson Act. Accordingly, this Court also finds that the fourth prong of the McCarran–Ferguson analysis is satisfied.[33]

This Court, therefore, concludes that the RICO claims alleged by the Premium Payor Class and the Co–Payor Class are barred by the McCarran–Ferguson Act. In doing so, the Court recognizes that Plaintiffs may view the interplay between the McCarran–Ferguson Act and ERISA as posing a preemptive "Catch–22," with McCarran–Ferguson precluding Plaintiffs' federal RICO claim and ERISA barring Plaintiffs' state RICO claim. The result is not entirely anomalous, however, given that Congress has occupied the field through ERISA by which certain well-defined remedies have been provided and others excluded.

## V. ORDERS

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment (# 804) is Granted to the extent that Judgment is hereby entered in favor of Defendants and against Plaintiffs as to Plaintiffs' First, Second, and Third Claims for Relief.

IT IS FURTHER ORDERED that Plaintiffs' Co–Payor Class only shall have to and including August 24, 1993, within which to file a Third Amended Complaint seeking relief on Plaintiffs' First Claim for Relief pursuant to 29 U.S.C. § 1132(a)(1)(B), consistent with Part II of this Memorandum Decision.

---

**33.** At oral argument, Plaintiffs for the first time argued that since Defendants' conduct could arguably be sanctioned under Nevada's RICO statute, N.R.S. § 207.470, the harsh remedies afforded by the federal RICO statute cannot be seen to displace or supersede existing Nevada law. This Court disagrees.

As recognized earlier in this Order, Plaintiffs could not pursue a Nevada RICO claim in this case given the fact that ERISA preempts such a claim. *See supra* at ——. Beyond this, it is clear that in adopting the Act, the Nevada legislature intended the Insurance Commissioner to have "exclusive jurisdiction" over fraudulent insurance practices. See N.R.S. § 686A.015. This, combined with the fact that the Nevada legislature specifically identified fraud on the part of the insured and *not* by the insurer as a possible predicate act under N.R.S. § 207.470, demonstrates an intent of the Nevada legislature to limit the amount of damages recoverable against an insurer for fraud. See N.R.S. §§ 207.360(30), 680A.200, 686A.160, 686A.170, 686A.290, 686A.291, and 686A.310.