**Barbara KENTY, et al., Plaintiffs–Appellants,**

v.

**BANK ONE, COLUMBUS, N.A., et al., Defendants–Appellees.**

No. 93–4211.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 1, 1994.

Decided Oct. 25, 1995.

Order Granting Rehearing Nov. 28, 1995.

1258

Michael P. Malakoff (briefed), Ellen M. Doyle (argued), Malakoff, Doyle & Finberg, Howard A. Specter, Joseph N. Kravec, Jr., Specter Law Offices, Pittsburgh, PA, for Barbara Kenty.

David S. Cupps (argued and briefed), Vorys, Sater, Seymour & Pease, Cleveland, OH, Michael J. Betts, Betts & Perry, Pittsburgh, PA, for Bank One, Columbus, N.A.

Joel Mirman, Benesch, Friedlander, Coplan & Aronoff, Columbus, OH, Mark P. Ladner (argued and briefed), Morrison & Foerster, New York City, for Transamerica Premier Ins. Co.

Before: MERRITT, Chief Judge; and KEITH and BOGGS, Circuit Judges.

MERRITT, Chief Judge.

Plaintiffs in this class action suit appeal the grant of summary judgment for the defendants by the district court. Each plaintiff contracted with Bank One for a loan to purchase an automobile. The terms of the loan required the plaintiffs to acquire collision and comprehensive automobile insurance, or in the alternative authorized the Bank to purchase the insurance for the plaintiffs. Each of the plaintiffs did not purchase insurance themselves, and the Bank purchased it for them from Transamerica Premier Insurance Company, a co-defendant in this case. The plaintiffs contend that the Bank breached the loan agreement and bought not only the insurance authorized by the agreement, but other coverage as well. Although they do not bring a breach of contract action, the plaintiffs do argue that the Bank violated three federal statutes: the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c); the National Bank Act, 12 U.S.C. § 85; and the anti-tying provisions of the National Bank Holding Company Act, 12 U.S.C. § 1972. The plaintiffs also claim that Transamerica violated RICO. The district court granted summary judgment for the defendants on all of these claims. We affirm the district court's rulings with respect to the National Bank Act and the anti-tying provision of the National Bank Holding Company Act. With respect to the RICO claims, we affirm the district court's ruling in part and reverse in part.

## I. Facts

The plaintiffs in this case individually contracted with the Bank for an automobile loan. The loan contract, which was identical in each case, provided that each plaintiff would purchase collision and comprehensive insurance coverage for the automobile they purchased with the loan proceeds. In the alternative, if a plaintiff did not purchase insurance the agreement provided that the Bank could take out an insurance policy on behalf of that plaintiff and add the charges to the balance of the loan. Specifically the Notice of Requirement to Provide Insurance executed by the plaintiffs stated:

I understand that the terms of my loan require that:

(a) I provide property insurance against loss or damage (subject to a maximum deductible of $250) on the collateral securing my loan, in an amount sufficient to cover the outstanding balance on my loan, plus any existing liens on the collateral. This coverage is commonly referred to as collision or comprehensive insurance ...

and

(b) The insurance policy contained a loss payable clause endorsement naming BANK ONE as the holder of a lien on the collateral.

. . . .

I understand that I may obtain the insurance from any agent or company of my choice; if I fail to obtain the required insurance, BANK ONE, at its option but without any obligation to do so, may apply in my name at my expense to purchase limited insurance for the protection of only Bank One for the amount of my loan. I authorize Bank One to add such insurance premiums, and finance charges thereon, to my loan balance. I understand that Bank One will retain a security interest in the collateral securing my loan until the entire balance, including any premiums and finance charges, is paid.

Each of the plaintiffs in the class did not purchase the insurance against loss or damage of their automobile, and the Bank purchased insurance for them from Transamerica.

The policy which the Bank purchased from Transamerica included endorsements which protected the automobiles (the Bank's collateral) from theft and damage that could diminish the value of the automobile. The plaintiffs do not contest these endorsements. In addition, however, the policy purchased from Transamerica also insured the Bank against malfeasance by the plaintiff-borrower and against losses that could be incurred by the Bank even when an automobile was repossessed in undamaged condition ("additional insurance"). For example, in the insurance policy taken out for the class representative, the coverage included protection against "borrower conversion, embezzlement and secretion of the vehicle"; expenses included in "repossessing the vehicle with a prior mechanics lien"; payments for a "loaned insurance premium if borrower defaults and vehicle is repossessed"; "repossession expenses"; "repossessed storage expenses"; "additional coverage to insure vehicle ... after insurance certificate has been cancelled while the vehicle is being repossessed"; and "waiver of Actual Cash Value to permit recovery of actual amount owed on loan." While the plaintiff was required to provide insurance only against "loss or damage," the Bank argues that these additional types of coverage were permitted under the clause allowing it to buy "limited insurance."

Although each plaintiff received notice that the Bank had purchased insurance from Transamerica in his or her name, the notice they received did not explain that the coverage included any additional coverage beyond protection against "loss or damage." In the case of the class representative, the notice only mentioned "extra endorsements" by number listing "CSI–1, 2, 3, 4, 5, 6, 7, 9, 10, 12, 13, 15." Subsequent notices sent to the plaintiffs included no further suggestion that the insurance coverage included protection of the Bank's loan beyond the value of the collateral in the undamaged automobile. All of the notices included a statement that "This Insurance Protects the Interest of the Lender in the Vehicle."

Each of the premiums were added to the balances on the plaintiffs' loans with the Bank. But, according to the plaintiffs, the Bank received rebates from Transamerica that were not reflected in the price each plaintiff was charged. Thus the Bank did not pass on the rebates to the plaintiffs, and therefore overcharged them for the insurance.

The district court dismissed all three of the plaintiffs' federal claims on a motion for summary judgment. While the case was pending in district court, the plaintiffs filed a similar claim in state court in Ohio on a breach of contract theory, and related state-law grounds. The Ohio Court of Appeals dismissed all the plaintiffs' claims. Recently, however, the Ohio Supreme Court overruled that decision and held that the plaintiffs did state a cause of action under Ohio law sufficient to survive summary judgment. As we read that decision, the Ohio Supreme Court also interpreted Ohio contract law to hold that the Bank breached its contracts with the plaintiffs when it purchased the additional insurance. *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 650 N.E.2d 863 (1995). Nonetheless, as there is now no final judgment in the Ohio state courts, we are not barred from considering this case under res judicata or collateral estoppel. *See State ex rel. Kirby v. S.G. Loewendick & Sons*, 64 Ohio St.3d 433, 596 N.E.2d 460, 463 (1992) (holding that final judgment required for estoppel by judgment and necessary determination needed for collateral estoppel).

## II. Standard of Review

We review the district court's grant of summary judgment *de novo*, using the same standard as that used by the district court. *See Moore v. Philip Morris Cos.*, 8 F.3d 335, 339 (6th Cir.1993). In deciding upon a motion for summary judgment, we must view the factual evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving party. *United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

### III. RICO

The plaintiffs assert that the Bank and Transamerica violated RICO in two respects. First, plaintiffs argue that the purchase of the additional coverage beyond loss and damage insurance violated RICO. Second, plaintiffs contend that the "kickbacks" that the Bank received from the insurance company also violated RICO.

A violation of RICO under 18 U.S.C. § 1962(c) requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). In order to establish "racketeering activity" the plaintiffs must allege a predicate act. Mail fraud, which the plaintiffs have alleged in this case, is a predicate act. 18 U.S.C. § 1961(1)(B).

Mail fraud consists of "a scheme or artifice to defraud and a mailing for the purpose of executing the scheme." *Bender v. Southland Corp.*, 749 F.2d 1205, 1215–16 (6th Cir.1984). A scheme to defraud consists of "[i]ntentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the designed end." *Id.* at 1216. To allege intentional fraud, there must be "proof of misrepresentations or omissions which were 'reasonably calculated to deceive persons of ordinary prudence and comprehension.'" *Blount Fin. Servs., Inc. v. Walter E. Heller & Co.*, 819 F.2d 151, 153 (6th Cir.1987) (citation omitted). Thus, the plaintiffs must allege with particularity a "false statement of fact made by the defendant which the plaintiff relied on." The plaintiff must also allege "the facts showing the plaintiff's reliance on the defendant's false statement of fact." *Id.* at 152. Alternatively, the plaintiff may allege an omission on which he or she relied. The issue in this case is whether the plaintiffs have sufficiently alleged a misrepresentation or an omission [that] was reasonably calculated to deceive persons of ordinary prudence and comprehension.

### A. Statement as to Type of Coverage Purchased

The plaintiffs argue that every insurance notice sent to them included the statement "This Insurance Protects in the Interest of the Lender in the Vehicle." The plaintiffs contend that this statement is a false statement of fact that was reasonably calculated to deceive them. Specifically, the plaintiffs argue that this statement led them to believe that they were only paying for loss and damage insurance when in fact they were also buying insurance that protected the Bank from malfeasance by the plaintiffs and from losses connected to the loan that might occur even if a secured automobile were not damaged or stolen. The plaintiffs stress that the word "Vehicle" is misleading and contend that to be correct the statement should have informed them that the insurance also protected the interest of the Bank in the loan.

This statement is not sufficiently misleading to form the basis of a fraud claim. The "Interest of the Lender" could be read to mean its interest in the vehicle as collateral. When read in this way, all of the insurance coverage can be construed to protect the Bank from diminution in value of its collateral, whether through damage, theft, or other costs incurred because the plaintiffs failed to make their payments (such as the cost of repossession). All of the coverage is designed to insure that the Bank will be fully secured up to the amount of the loan balance. While we recognize that one could read this statement another way, the language is too vague for us to conclude that the statement was "reasonably calculated to deceive" the plaintiffs. Furthermore, the same notice on which this statement appears includes a section which lists by number all of the policy endorsements about which the plaintiff complains. Although the plaintiffs would have had to ask the Bank or Transamerica what these codes stood for, it would have required minimal effort to do so. If the Bank or Transamerica were attempting to deceive the plaintiffs, it is hardly likely that they would have placed all of the endorsements on the notices sent to the plaintiffs. In addition, the presence of these endorsements on the face

of the notices undermines the plaintiffs' claims that they reasonably relied on the statement they cite as misleading. A claim of fraud does not inevitably follow from every breach of a contract. Even if the Bank breached the loan agreements here, the plaintiffs still must point to a falsehood that would form the basis for fraud. They have failed to do so. Consequently, the district court properly granted summary judgment for the defendants on this issue because the plaintiffs failed to state with particularity a false statement of fact.

### B. Insurance Rebates from Transamerica to the Bank

The plaintiffs also contend that the Bank and Transamerica entered into an agreement that provided the Bank with rebates or "kickbacks" for placing the insurance with Transamerica. Although the defendants argue that these sums were insurance "commissions" that were paid to an affiliate of the Bank, for the purposes of this review we must interpret the facts in the light most favorable to the plaintiffs.

Irrespective of what type of coverage the plaintiffs believed they were purchasing, they clearly thought that they were being charged what it cost the Bank to buy the insurance. The Notice to Provide Insurance signed by the plaintiffs included the statement: "I authorize Bank One to add such insurance premiums, and finance charges thereon, to my loan balance." If the Bank was receiving a discount on the cost of the insurance that it did not pass on to the plaintiffs, it was engaging in a form of deceit.

In *Dana Corp. v. Blue Cross & Blue Shield of Northern Ohio*, this Court ruled on similar facts that an allegation of failure to pass on an insurance rebate was sufficient to state a claim under RICO. 900 F.2d 882 (6th Cir.1990). In that case, the plaintiff corporation hired Blue Cross to provide administrative services only for health insurance. In other words, the company was a self-insurer, but paid Blue Cross to administer payments to health care providers. Under the agreement, Blue Cross would pay its usual 97% of the cost of a medical bill to a health care provider and then bill the plaintiff for that amount. But, Blue Cross received rebates from several hospitals that it never passed on to the plaintiff. It also led the plaintiff to believe that it was passing on all of the rebates. The court held that this failure to pass on rebates was sufficiently fraudulent to state a claim under RICO.

■ In this case, we may interpret the Bank's failure to pass on the rebates to the plaintiffs as creating either fraudulent omissions or affirmative misrepresentations. The Bank neither informed the plaintiffs that it was receiving these rebates on the insurance, nor that it had an agreement with Transamerica regarding rebates. The plaintiffs had no reasonable possibility of discovering that the agreement existed, or that rebates were being paid. *Cf. Blount*, 819 F.2d at 153 (finding that plaintiffs with "ordinary prudence and comprehension" would have identified any misrepresentation). Consequently, the plaintiffs could not reasonably be expected to know that these rebates were being paid unless either the Bank or Transamerica informed them. Hence, when the facts are construed in the light most favorable to the plaintiffs, this omission can rise to the level of one "reasonably calculated to deceive" the plaintiffs. Furthermore, it is clear that because they were not provided with the information, the plaintiffs acted to their detriment by paying the inflated premiums.

■ In addition, one can interpret the sums listed on the notices sent to the plaintiffs as affirmative misrepresentations. If the actual cost to the Bank of the insurance was less than the actual sum listed on the notice, then that sum can constitute a misrepresentation "reasonably calculated to deceive" the plaintiffs, particularly given that they had no independent means of ascertaining the actual cost of the insurance to the Bank. Again, the plaintiffs clearly relied to their detriment on the sum presented on the notices. Consequently, we must reverse the district court with respect to this RICO claim as against the Bank. Further factual development will be necessary, however, to determine the precise nature of the agreement between the Bank and Transamerica, and whether the Bank was passing on its actual

costs for purchasing the insurance to the plaintiffs.

### C. McCarran-Ferguson Act Exemptions

The plaintiffs also charge that Transamerica should be held liable under RICO pursuant to the same theories that make the Bank liable. But Transamerica responds that it is exempt from RICO liability under the McCarran–Ferguson Act. That statute provides:

> (b) No Act of Congress shall be construed to invalidate, impair or supersede any law enacted by any state for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance.

15 U.S.C. § 1012 (1976). Thus, because RICO does not "specifically relate to the business of insurance," the initial questions here are (1) whether the conduct by the insurance company in this case constitutes the business of insurance, and (2) whether it is regulated by Ohio insurance law. In *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982), the Supreme Court set out three factors that define when a company is engaging in the business of insurance for the purposes of the McCarran–Ferguson Act to apply: the practice must (1) have the effect of transferring or spreading a policyholder's risk; (2) be an integral part of the policy relationship between the insurer and the insured; and (3) be limited to entities within the insurance industry. *Id.* at 129, 102 S.Ct. at 3009, *see also Pilot Life Insurance Co. v. Dedeaux*, 481 U.S. 41, 48–49, 107 S.Ct. 1549, 1553–54, 95 L.Ed.2d 39 (1987). Here Transamerica clearly is engaging in the business of insurance by providing policies that spread the Bank's and the plaintiffs' risks. The policies and the receipt of premiums are the essence of the policy relationship between the insurer and the insured, no matter whether one views the Bank or the plaintiffs as the insured. Finally, it seems clear that the sale of insurance coverage is one that is limited to entities within the insurance industry. Thus, under the *Union Labor Life* and *Pilot Life* definition, Transamerica was engaging in the business of insurance.

In addition, Ohio has several state-law statutes that regulate insurance premiums, rebates and commissions. *See* Ohio Rev. Code Ann. § 3937 (casualty and motor vehicle insurance), § 3905.05 (commissions), § 3933.01 (rebates), and § 3901.21(G)(1) (unfair and deceptive acts defined) (Baldwin 1994); *see also United States Dep't of Treasury v. Fabe*, —— U.S. ——, ——, 113 S.Ct. 2202, 2204, 124 L.Ed.2d 449 (1993) (addressing question of when, under McCarran–Ferguson, a state statute is " 'for the purpose of regulating the business of insurance' "). Notably, Ohio law does not provide for a direct private cause of action for an insured if an insurance company violates any of these regulations. Instead it creates an administrative review process. *See* Ohio Rev.Code Ann. §§ 3901.22, 3937.04(B) (Baldwin 1994). In some instances insurance companies may be held criminally liable. Ohio Rev.Code Ann. § 3999.

Once it is determined that McCarran–Ferguson applies, the central question depends on whether RICO will "invalidate, impair or supersede" any section of the Ohio insurance code. Under this analysis, McCarran–Ferguson requires three inquiries: (1) does the federal statute at issue "specifically relate to the business of insurance;" (2) was the state statute at issue "enacted for the purpose of regulating the business of insurance;" and (3) would application of the federal statute "invalidate, impair or supersede" the same statute. *Ambrose v. Blue Cross*, 891 F.Supp. 1153, 1159 (E.D.Va.1995) (citing *Fabe*, —— U.S. at ——, 113 S.Ct. at 2208). It is clear that RICO does not specifically relate to the business of insurance and that the provisions of Ohio's insurance code, including those on "unfair and deceptive practices" under Ohio Rev.Code Ann. § 3901.21, obviously were enacted for the purpose of regulating insurance. Thus, the only pertinent question that remains is whether RICO invalidates, impairs or supersedes these sections of the Ohio Revised Code.

Recently, this Court in *Nationwide Mutual Ins. Co. v. Cisneros*, held that the McCarran–Ferguson Act did not bar application of the federal Fair Housing Act to insurers who were accused of discriminating in

issuing home owner insurance policies in Ohio, even though the Ohio Revised Code contained provisions also designed to combat discrimination in housing insurance. 52 F.3d 1351, 1363 (6th Cir.1995). The insurance company claimed that the Fair Housing Act impaired or superseded the Ohio Revised Code in two respects. First, it claimed that the Fair Housing Act allowed claims based on disparate impact that were not permissible under the Ohio Revised Code. *Id.* at 1361. Second, it argued that the Fair Housing Act created a private right of action allowing jury trials and punitive damages that were not permissible under Ohio's administrative review process. *Id.* at 1363. The *Nationwide* court held that the issue of whether the Fair Housing Act impaired the Ohio Code because it allowed claims based on disparate impact was not ripe. *Id.* It then held that allowing additional procedural means, such as jury trials or punitive damages could not be said to be impairing or superseding Ohio law. *Id.* *Nationwide* stands for the proposition that McCarran–Ferguson protects the substantive measures embodied in state law. A party seeking to invoke McCarran–Ferguson cannot simply point to additional procedural measures included in a federal law without identifying some substantive aspect of the state law that is being invalidated, impaired or superseded. Thus, as the plain language of the statute suggests, this is fundamentally a question of what effect RICO has on the state law. *Ambrose*, 891 F.Supp. at 1166–67.

■ In this case, Transamerica has pointed to several substantive sections of the Ohio Revised Code that would be either impaired or superseded by application of RICO. Most notably, sections 3901.21–.22 of the Ohio Revised Code provide detailed regulation and remedies for unfair and deceptive acts, including making misrepresentations and providing rebates. The different liability under Ohio law for violations, as well as different standards of proof necessary to demonstrate misrepresentations, means that RICO does impair the ability of Ohio to regulate this type of behavior. In particular, RICO calls for treble damages, which Ohio law does not. RICO requires some showing of fraud, whereas Ohio law flatly outlaws rebates in auto insurance regardless of whether fraud is

involved. Finally, Ohio law may employ a different standard than the one under RICO to determine when a "misrepresentation" violates its statute. In short, applying RICO to insurance companies would subject them to a different standard of behavior than the one envisioned by Ohio. By holding insurance companies liable under a federal law, such as RICO, when Ohio law provides for no liability, RICO would impair the regulatory framework within which Ohio expects its insurance companies to do business.

In this instance, application of RICO to Transamerica is precluded by McCarran–Ferguson. Consequently, state law governs whatever misconduct Transamerica may have committed. For cases holding insurance companies exempt from RICO actions under McCarran–Ferguson *see Ambrose*, 891 F.Supp. at 1168, *Forsyth v. Humana, Inc.*, 827 F.Supp. 1498, 1520 (D.Nev.1993); *LeDuc v. Kentucky Cent. Life Ins. Co.*, 814 F.Supp. 820, 829 (N.D.Cal.1992); *Everson v. Blue Cross*, No. 93CV7534, 1994 WL 675200, at 10–13, 1994 U.S. Dist. LEXIS 14754, at * *29–39, 18 Employee Benefits Cas. (BNA) 2062 (N.D.Ohio 1994). *But see Merchants Home Delivery Serv., Inc. v. Hall & Co.*, 50 F.3d 1486, 1491 (9th Cir.1995) (holding that the RICO claim is not barred by McCarran–Ferguson because fraudulent collection of money for false claims is not "business of insurance").

■ Some disagreement exists, however, as to whether banks should also be entitled to exemption under McCarranFerguson. *Compare Gordon v. Ford Motor Credit Co.*, 868 F.Supp. 1191, 1197 (N.D.Cal.1992) (holding that McCarran–Ferguson does protect finance company from RICO action) *with Bermudez v. First of America Bank Champion*, 860 F.Supp. 580, 589–91 (N.D.Ill.1994) (ruling that McCarran–Ferguson does not protect bank). In the present case, the Bank is not protected by McCarran–Ferguson. The Bank cannot claim here that it was engaged in the practice of risk spreading or transferring risk. Instead it was purchasing insurance to protect its own security interest, and then was passing the costs along to the plaintiffs. Indeed, all of the documentation

makes clear that the insurance purchased from Transamerica is for the Bank's protection, and is limited to the outstanding balance on the loans held by the Bank. *See Bermudez,* 860 F.Supp. at 589–91. As the *Bermudez* court noted, "[t]he fact that the unlawful practices alleged in the instant case involve a scheme for passing on the cost of insurance premiums does not covert this case into one limited to the insurance industry." *Id.* at 591. Therefore, because the Bank was not engaged in the practice of insurance, it is not protected from this RICO action by the McCarran–Ferguson exemption.

### IV. The National Bank Act

The plaintiffs also contend that they have been charged excessive interest by the Bank on the premiums that were added to their automobile loans. The Bank is a nationally chartered bank and therefore governed by the National Bank Act. 12 U.S.C. § 38 *et al.* (1988). The National Bank Act and its accompanying regulations allow nationally chartered banks to charge up to the maximum permitted to the most-favored state-chartered banks in the state in which they are operating. The National Bank Act provides in relevant part:

> Any association may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidences of debt, interest at the rate allowed by the laws of the State ... where the bank is located....

12 U.S.C. § 85. This statute has been interpreted by the Supreme Court, under the Most Favored Lender Doctrine, to allow banks to charge the rate allowed to the "most favored lenders" under state law. *Marquette Nat'l Bank v. First of Omaha Service Corp.,* 439 U.S. 299, 314 n. 26, 99 S.Ct. 540, 548 n. 26, 58 L.Ed.2d 534 (1978) (citing 12 C.F.R. § 7.7310).

Consequently, the maximum interest rate allowed to banks under Ohio law determines whether the Bank in this case has charged excessive interest. The Ohio Revised Code allows "building and loan" banks as well as savings banks to charge unlimited dues, fines, interest and premiums on "loans made." Ohio Rev.Code Ann. §§ 1151.21, 1161.28 (Baldwin 1994). The defendants argue convincingly that when the Bank acted pursuant to the Notice to Provide Insurance signed by the plaintiffs and added the premiums to the outstanding balances on the plaintiffs' automobile loans, it was making a loan for the amount of the premium. Thus, adding the premiums to the loan balance constituted "loans made" under Ohio law, and consequently the Bank could charge any amount of interest on these loans.

The plaintiffs contend that the charges for the insurance were not "loans made" and are governed by another section of the Ohio Revised Code that limits the interest chargeable on forbearances or payments of money at a future time. This statute provides:

> (A) The parties to a bond, bill, promissory note, or other instrument of writing for the forbearance or payment of money at any future time, may stipulate therein for the payment of interest upon the amount thereof at any rate not exceeding eight percent per annum payable annually, except as authorized in division (B) of this subsection [which does not apply to the present case].

Ohio Rev.Code Ann. § 1343.01(A). The plaintiffs argue that the premiums were due immediately and that the Bank allowed them a forbearance or alternatively accepted their promise to pay at a future time. Under the National Bank Act, interest on these obligations cannot exceed eight percent. Because the interest rate on the automobile loans exceeded eight percent, when the Bank added the premium to the loan balance it began charging interest on the premiums that exceeded eight percent.

But the Bank did not forbear its right to collect the premiums. Under Ohio law, in order for a forbearance to occur a party must forego all of its legal rights to collect money or enforce an obligation for a specified period of time. *See, e.g., Kellogg–Mackay Co. v. O'Neal,* 39 Ohio App. 372, 177 N.E. 778, 782 (1931). Here, the Bank could collect part of the premiums each time an installment on the loan came due. In addition, the Bank and the plaintiffs did not make an agreement for "payment at a future time." The annual insurance premiums were due in full when

the notices were sent to the plaintiffs, and the Bank then financed the amount due by granting an extension of the automobile loan. Finally, the Notice of Requirement to Provide Insurance that each plaintiff signed specifically states that the premiums and other charges associated with the insurance will be "added to [the] loan balance." Nowhere in any of the contracts does the word "forbearance" appear. The language of the agreements indicates that the plaintiffs were obligated to pay the loan made by the Bank to finance the premiums. Consequently, these contracts for loans are governed by the Most Favored Lender Doctrine, and there is no limit on the amount of interest the Bank could charge.

## V. Anti-Tying Claims under the National Bank Holding Company Act

The plaintiffs also contend that the Bank's requirement that they purchase insurance constituted an illegal tying arrangement that is prohibited by the National Bank Holding Company Act. The anti-tying provisions of that Act apply antitrust principles to the banking industry. They provide in relevant part:

> (1) A bank shall not in any manner extend credit, lease or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement—
>
> > (A) that the customer shall obtain some additional credit, property, or service from such bank other than a loan, discount, deposit, or trust service;
> >
> > * * *
> >
> > (C) that the customer provide some additional credit, property, or service to such bank, other than those related to and usually provided in connection with a loan, discount, deposit, or trust service.

12 U.S.C. § 1972. The purpose of this Act is "to apply the general principles of the Sherman Antitrust Act prohibiting anticompetitive tying arrangements specifically to the field of commercial banking." *Parsons Steel, Inc. v. First Alabama Bank*, 679 F.2d 242, 245 (11th Cir.1982).

To recover under the anti-tying provisions of 12 U.S.C. § 1972, a plaintiff must prove three things: "(1) an anticompetitive tying arrangement; (2) the banking practice at issue was unusual in the banking industry; and (3) the practice must benefit the bank." *Sanders v. First Nat'l Bank & Trust Co.*, 936 F.2d 273, 278 (6th Cir.1991). Unlike other antitrust claims, under this statute the plaintiff only need demonstrate an anticompetitive practice or arrangement and need not show that it had any anticompetitive effect. *Costner v. Blount Nat'l Bank*, 578 F.2d 1192, 1196 (6th Cir.1978); *Davis v. First Nat'l Bank of Westville*, 868 F.2d 206, 208 (7th Cir.), *cert. denied*, 493 U.S. 816, 110 S.Ct. 68, 107 L.Ed.2d 35 (1989).

In this case, the plaintiffs allege that the Bank's actions violated the anti-tying provisions in two respects. First, the plaintiffs argue that the Bank's requirement that they purchase insurance (whether authorized or unauthorized) as a condition of granting the automobile loan violates the anti-tying provisions. But, the Bank did not require that the plaintiffs purchase any insurance through it or Transamerica. Indeed, the plaintiffs were free to purchase the insurance on the open market at fully competitive prices. In a sense, the Bank was willing to compete with other providers of insurance and thus it is hard to see how this practice can be considered anti-competitive. Furthermore, at least with respect to the loss and damage insurance, it is a common practice in the banking industry for banks to require borrowers to insure collateral. Thus the district court was correct in dismissing the portion of the anti-tying claim based on this theory.

The plaintiffs' second theory alleges a more substantial claim. The plaintiffs contend that only the "additional insurance" that did not cover loss or damage of the automobile was illegally tied either to the authorized loss or damage insurance or to the underlying automobile loan. The validity of this claim turns on whether the Bank breached the loan agreement when it charged the plaintiffs for the additional insurance. If the Bank did breach, then the plaintiffs never agreed to purchase the additional insurance

**1268**

and therefore its purchase simply was not a "condition or requirement" of purchasing the authorized loss or damage insurance or receiving the automobile loan. More simply, a valid breach of contract claim cannot be converted into an anti-tying claim.

As we read the Ohio Supreme Court's recent opinion, under Ohio law the Bank breached the loan agreement when it purchased the additional insurance. Although the Ohio Supreme Court only addressed whether the plaintiffs could survive a summary judgment motion on the question of whether they could recover on a claim of intentional interference with a contract, as part of its analysis it held as a matter of law that the Bank did breach the loan agreement. The Ohio Supreme Court noted that the tort of intentional interference with a contract consists of five elements, one of which is "the wrongdoer's intentional procurement of the contract's breach." *Kenty,* 650 N.E.2d at 866. The Court then held that, when the facts were construed in the light most favorable to the plaintiffs, the Bank "[charged] Kenty for insurance that she was not required to purchase." *Id.* Furthermore the Court held that "this overcharging for insurance coverage could have been a breach by [the. Bank] induced by the appellees." *Id.* While on the record there may be some dispute of material fact as to who induced the breach and whether or not that breach was intentional, there appears no dispute of material fact as to whether a breach occurred. There is no dispute as to the terms of the loan agreement, nor is there any dispute of fact as to what types of insurance the Bank purchased on behalf of the plaintiffs. The Ohio Supreme Court's opinion must be read as holding that the Bank's purchase of the additional insurance was a breach of the loan agreement under Ohio law. Consequently, the plaintiffs never agreed to purchase the additional insurance, and the Bank never made its purchase a condition or requirement of receiving the automobile loan, or purchasing the authorized loss and damage insurance. Thus, the anti-tying claims based on this second theory were also properly dismissed by the district court.

The judgment of the district is AFFIRMED in part, and REVERSED in part. The case is REMANDED for further proceedings on the remaining portion of the RICO claim.

### ORDER

#### Nov. 28, 1995

The panel is granting rehearing in the above case to be set on Wednesday, February 7, 1996. In light of the fact that the panel is going to rehear the case, the petition for en banc rehearing will not be acted upon by the court.