**UNITED STATES of America**

v.

**Allen W. STEWART.**

**Criminal Action No. 96–583.**

United States District Court, E.D. Pennsylvania.

Feb. 21, 1997.

**386**

Linda Dale Hoffa, U.S. Attorney's Office, Philadelphia, PA, for U.S.

Robert E. Welsh, Jr., Philadelphia, PA, for Stewart.

### MEMORANDUM

BARTLE, District Judge.

On December 4, 1996, the grand jury returned a 63 count indictment against Allen W. Stewart ("Stewart"). It charges: (1) a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962; (2) 12 acts of mail fraud, in violation of 18 U.S.C. § 1341; (3) 13 acts of wire fraud, in violation of 18 U.S.C. § 1343; and (4) 35 acts of money laundering in violation of 18 U.S.C. § 1957. The final two counts of the indictment seek forfeiture of Stewart's assets.

Stewart now moves this court to dismiss the indictment on two grounds pursuant to

Rule 12(b) of the Federal Rules of Criminal Procedure.[1] He states that the indictment fails to allege all the required elements of a RICO violation and that the entire indictment is "preempted" by state law by reason of the McCarran–Ferguson Act, 15 U.S.C. §§ 1011 *et seq.*

In a motion to dismiss the indictment we accept as true the facts alleged in the indictment and determine if those facts "constitute the violation of law for which [the defendant] is charged." *United States v. Polychron*, 841 F.2d 833, 834 (8th Cir.), *cert. denied*, 488 U.S. 851, 109 S.Ct. 135, 102 L.Ed.2d 107 (1988); *United States v. Seitz*, Crim. A. No. 96–272–2, 1997 WL 34690, at *1 (E.D.Pa. Jan. 29, 1997). If the facts do not constitute a violation of federal law, the charges should be dismissed. *Polychron*, 841 F.2d at 834.

According to the indictment, Stewart committed a pattern of racketeering activity through his association with Summit National Life Insurance Company ("Summit"), now incorporated in Pennsylvania, which he purchased in 1988. ¶ 3. Stewart allegedly "acquired control of Summit ... through a scheme wherein the costs of acquiring the company, including the purchase price, were paid from the insurance company's own funds after it was acquired." ¶ 6. By acts of wire and mail fraud, Stewart devised and furthered schemes to siphon funds out of Summit as well as Equitable Beneficial Life Insurance Company ("Equitable"), another Pennsylvania domestic life insurance company he controlled. ¶¶ 4, 11. Summit's capital and surplus was $38 million when Stewart purchased the company in 1988, but decreased to negative $80.5 million by 1993. ¶ 10. Likewise, Equitable's capital and surplus was reduced from $2 million in 1988 to negative $43.2 million in 1993. ¶ 12. Through a series of transactions which inflated the book value of Summit's and Beneficial's assets, Stewart concealed his theft of funds from the public, insurance regulators, policy-

---

**1.** Stewart does not specifically mention the subsection of the rule on which he is relying to dismiss the indictment. We assume it is pursuant to Rule 12(b)(2) which provides in relevant

part "[t]he following must be raised prior to trial ... (2)[d]efenses and objections based on defects in the indictment or information...."

holders, customers, potential customers, insurance agents, and others. ¶¶ 28, 46–47, 51. Stewart sold both insurance companies in 1993. ¶ 13.

## I

 Stewart contends that these allegations, even if true, do not comprise a RICO violation under 18 U.S.C. § 1962(c),[2] because an entity cannot be both the enterprise through which the racketeering acts were committed and the victim of such racketeering activity. Since the indictment states that Summit was the enterprise as well as the victim, Stewart argues that no RICO violation exists and this count must be dismissed.

Congress originally enacted RICO to combat organized crime. *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 487, 105 S.Ct. 3275, 3280, 87 L.Ed.2d 346 (1985). However, it "has become a tool for everyday fraud cases brought against respected and legitimate enterprises." *Id.* at 499, 105 S.Ct. at 3286. The statute is to be "liberally construed." Pub.L. 91–452, § 904(a), 84 Stat. 947. Section 1962(c) of RICO, states:

> [i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). An enterprise is broadly defined to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). A pattern of racketeering activity arises when at least two acts of racketeering are committed within ten years of each other. 18 U.S.C. § 1961(5).

In *National Organization for Women, Inc. v. Scheidler,* 510 U.S. 249, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994), the United States Supreme Court addressed the enterprise requirement. It stated that the term enterprise "connotes generally the vehicle through which the unlawful pattern of racketeering activity is committed, rather than the victim of that activity." *Id.* at 259, 114 S.Ct. at 804. The Third Circuit has interpreted this language to mean that a

> victim corporation "drained of its own money" by pilfering officers and employees could not reasonably be viewed as the enterprise through which employee persons carried out their racketeering activity. Rather, in such an instance, the proper enterprise would be the association of employees who are victimizing the corporation, while the victim corporation would not be the enterprise, but instead the § 1962(c) claimant.

*Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.,* 46 F.3d 258, 267 (3d Cir.1995). Stewart is correct that the enterprise and victim cannot be the same entity.

However, a reading of the indictment establishes that the enterprise and the victim are not entirely the same in this case. In paragraphs 2 and 3, the enterprise is described not only as Summit, but also as Stewart. The victims of the schemes to defraud included Summit as well as Beneficial, the regulators, policyholders, customers, potential customers, insurance agents, the public, and others. ¶¶ 10, 11, 28, 46–47, 51. Stewart cites no case in which a criminal RICO count was entirely dismissed solely because the victim and the enterprise overlapped. We agree with the government that the better remedy is an instruction to the jury that before any criminal liability attaches it must find that someone other than Summit was a victim of Stewart's acts of racketeering.

Stewart also maintains that the indictment is defective because it charges him with the improper acquisition of Summit. That is not, and cannot be, a § 1962(c) violation.[3] While paragraphs 16 through 26, entitled "Acquisition of Summit National Life Insurance Company," introduce Racketeering Act 1, the acquisition is not charged as a separate criminal act. The only predicate act specifically

---

2. The indictment does not specify which portion of § 1962 was violated, but its language mirrors that of § 1962(c).

3. Rather, such an acquisition would be a violation of §§ 1962(a) or (b).

related to the acquisition of Summit appears to be Racketeering Act 1A which refers to a wire transfer of money from Equitable used as part of the purchase money for Summit. The indictment does not suggest that the procurement of Summit was a separate scheme or racketeering act or that it violated § 1962(c). It is merely relevant information surrounding the detailed plot to defraud. As such, we find no merit to Stewart's position.

## II

■ Stewart next argues that the McCarran–Ferguson Act "preempts" the indictment, that is, that federal law withdraws its preemption and allows state rather than federal law to control.[4] Prior to 1944, insurance regulation was solely within the domain of the states since insurance was not considered to be interstate commerce. *See Paul v. Virginia*, 75 U.S. (8 Wall.) 168, 183, 19 L.Ed. 357 (1868). A dramatic turn occurred in *United States v. South–Eastern Underwriters Ass'n*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), a criminal antitrust case, when the United States Supreme Court held that insurance was a transaction of interstate commerce subject to federal regulation. In response, Congress passed the McCarran–Ferguson Act, 15 U.S.C. §§ 1011 *et seq.*, which reaffirmed the primacy of state regulation of insurance. *See St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 538–39, 98 S.Ct. 2923, 2928–29, 57 L.Ed.2d 932 (1978). The Act provides, "[t]he business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business." 15 U.S.C. § 1012(a). With respect to federal regulation, the Act continues in pertinent part:

> [n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, ... unless such Act specifically relates to the business of insurance.

15 U.S.C. § 1012(b).

■ To decide whether a federal law must yield to state law pursuant to the McCarran–

Ferguson Act, we must consider four questions: (1) does the federal law specifically relate to the business of insurance? (2) has Pennsylvania enacted any law for the purpose of regulating the challenged activity? (3) does the challenged activity constitute business of insurance? and (4) would application of the federal law invalidate, impair, or supersede the state law? *Cochran v. Paco, Inc.*, 606 F.2d 460, 464–66 (5th Cir.1979); *First Nat'l Bank of Pa. v. Sedgwick James of Minn., Inc.*, 792 F.Supp. 409, 417 (W.D.Pa. 1992).

Stewart and the government agree that federal criminal laws in issue do not specifically relate to the business of insurance. *See Senich v. Transamerica Premier Ins. Co.*, 766 F.Supp. 339, 340 (W.D.Pa.1990). Likewise, the parties are in accord that the Commonwealth of Pennsylvania has enacted laws governing the challenged activity. It is on the third and fourth issues where the parties disagree. If the challenged activity constitutes the business of insurance *and* federal law would invalidate, impair, or supersede state law, the indictment is barred. *Cochran*, 606 F.2d at 464. Otherwise, the indictment stands.

We must first determine if the challenged activity, alleged of Stewart, constitutes the "business of insurance." *Cochran*, 606 F.2d at 464–66. The meaning of the term does not include all the functions and operations of an insurance company. In noting its limited scope, the Supreme Court has said that "[i]nsurance companies may do many things which are subject to paramount federal regulation; only when they are engaged in the 'business of insurance' does the [McCarran–Ferguson] statute apply." *SEC v. National Sec., Inc.*, 393 U.S. 453, 459–60, 89 S.Ct. 564, 568, 21 L.Ed.2d 668 (1969).

The Supreme Court has held that, in determining whether an activity is the "business of insurance," we must ask:

> first, whether the practice has the effect of transferring or spreading a policyholder's

---

4. The term "preemption" refers to "certain matters [that] are of such a national, as opposed to local, character that federal laws [ ] take precedence over state laws." *Black's Law Dictionary*

(6th ed. 1990). Because under the McCarran–Ferguson Act, state law would be displacing federal law, the term preemption is not accurate.

risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry. None of these criteria is necessarily determinative in itself. . . .

*Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 129, 102 S.Ct. 3002, 3009, 73 L.Ed.2d 647 (1982) (emphasis omitted). In *United States Department of Treasury v. Fabe,* 508 U.S. 491, 504, 113 S.Ct. 2202, 2209–10, 124 L.Ed.2d 449 (1993), the Court explained that the business of insurance also includes the performance of the insurance contract because "[w]ithout performance of the terms of the insurance policy, there is no risk transfer at all." In that case, an Ohio statute gave the claims of policyholders priority over claims of the federal government in the liquidation of an insolvent insurance company, in direct contravention of federal bankruptcy law. *Id.* at 493, 113 S.Ct. at 2204. The Court upheld that state statutory provision under the McCarran–Ferguson Act because it protected policyholders. *Id.* at 493–94, 113 S.Ct. at 2204. The Court reasoned that "the enforcement of insurance contracts by ensuring the payment of policyholders' claims . . . [was] integrally related to the performance of insurance contracts after bankruptcy." *Id.* at 504, 113 S.Ct. at 2209.

According to the indictment, the challenged activity of Stewart consisted of the use of the wires and mails for fraudulent transactions to siphon large sums of money from two insurance companies he controlled, rendering them insolvent. While Stewart's actions obviously affected the insurance companies and thus their policyholders, that is not the test for determining whether he was engaged in the business of insurance. The applicable standard under the McCarran–Ferguson Act is much more circumscribed. *Fabe,* 508 U.S. at 508–09, 113 S.Ct. at 2211–12; *Pireno,* 458 U.S. at 128–33, 102 S.Ct. at 3008–11. Stewart's activities, even if legitimate, do not fit within any of the guideposts enunciated by the Supreme Court. They did not have "the effect of transferring or spreading a policyholder's risk," and were not an "integral part of the policy relationship between the insurer and the insured."

*Pireno,* 458 U.S. at 129, 102 S.Ct. at 3009. Moreover, the financial transactions in which Stewart was engaged, whether they be legal or illegal, were not of the kind that are "limited to entities within the insurance industry." *Pireno,* 458 U.S. at 129, 102 S.Ct. at 3009. Nor are we concerned here with priority of payments to policyholders under a liquidation statute so as to carry out the performance of contracts. *See Fabe,* 508 U.S. at 493, 113 S.Ct. at 2204. We conclude that Stewart was not engaged in the business of insurance when he undertook the activities alleged.

■ Assuming, however, that Stewart's conduct· was the business of insurance because in some broad sense it undermined the performance of insurance contracts, we next consider whether the prosecution of this case, based upon RICO, as well as mail and wire fraud, will "invalidate, impair or supersede" any Pennsylvania law enacted for the purpose of regulating the business of insurance. *Cochran,* 606 F.2d at 464. If so, the indictment must be dismissed. Since the terms "invalidate, impair or supersede" are not defined in the McCarran–Ferguson Act, we will apply their ordinary meaning. *Asgrow Seed Co. v. Winterboer,* 513 U.S. 179, 186–88, 115 S.Ct. 788, 793, 130 L.Ed.2d 682 (1995). To invalidate means to "make invalid, deprive of efficacy," while impair signifies to "lessen in quality or strength, damage." *New Webster's Dictionary and Thesaurus* 485, 508 (1993). To supersede is to "outmode and take the place of." *Id.* at 994.

In *SEC v. National Securities Inc.,* 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), the Supreme Court was confronted with a merger between two insurance companies which the state of Arizona had approved but which the Securities and Exchange Commission ("SEC") sought to unravel because of fraud. *National Sec.,* 393 U.S. at 455–56, 89 S.Ct. at 566–67. The merged insurance company defended on the ground that the federal securities law impaired the state insurance law under which the merger had been endorsed. *Id.* at 457, 89 S.Ct. at 567. The Court first noted that Arizona was not regulating the relationship between insurer and

insured, but between the stockholder and the company. *Id.* at 460, 89 S.Ct. at 568–69. In determining whether the application of federal securities law would supersede or impair state law, it found that the SEC's complaint focused not on the merger, but on the fraud. *Id.* at 462, 89 S.Ct. at 569–70. "The merger became relevant only insofar as it was necessary to attack it in order to undo the harm caused by the alleged deception." *Id.* Although conceding the possibility of a "most indirect" impairment, the Court emphasized the fact that the "Federal government is attempting to protect security holders from fraudulent misrepresentations." *Id.* at 463, 89 S.Ct. at 570. Because the federal interest in protecting shareholders was "perfectly compatible" with the state interest in protecting policyholders, the federal securities laws did not invalidate, impair or supersede state law. *Id.*

Defendant points us to several cases which held that the McCarran–Ferguson Act invalidated a civil RICO claim because application of RICO in that context would impair, invalidate, or supersede state regulatory provisions. *See Kenty v. Bank One,* 92 F.3d 384, 392 (6th Cir.1996); *Ambrose v. Blue Cross & Blue Shield,* 891 F.Supp. 1153, 1168 (E.D.Va. 1995), *aff'd,* 95 F.3d 41 (4th Cir.1996); *Wexco Inc. v. IMC, Inc.,* 820 F.Supp. 194, 203 (M.D.Pa.1993); *Senich,* 766 F.Supp. at 342; *Richhart v. Metropolitan Life Ins. Co.,* Civ. A. No. 89–1725, 1990 WL 39268, at *3 (E.D.Pa. Mar. 30, 1990). However, these cases involved transactions which can be characterized as the business of insurance. In all, the insureds sued their insurers on account of some alleged wrongdoing related to the purchase or terms of their insurance policies. *Kenty,* 92 F.3d at 388–89; *Ambrose,* 891 F.Supp. at 1155–56; *Wexco,* 820 F.Supp. at 196–97; *Senich,* 766 F.Supp. at 341; *Richhart,* 1990 WL 39268, at *1. The courts held that applying RICO would impair, invalidate or supersede state regulatory provisions because RICO allowed a private cause of action when state law did not. *Ambrose,* 891 F.Supp. at 1165; *Wexco,* 820 F.Supp. at 203; *Senich,* 766 F.Supp. at 341;

*Richhart,* 1990 WL 39268, at *3. Moreover, the remedies RICO provides, including treble damages and attorney's fees, significantly differed from those provided to private parties under their respective state laws. *Kenty,* 92 F.3d at 392; *Ambrose,* 891 F.Supp. at 1165; *Wexco,* 820 F.Supp. at 203. In contrast, this is a criminal action. The federal government is not a private plaintiff seeking to act outside of the state's regulatory scheme. Therefore, these cases are not controlling.

At least three criminal cases have held that the federal government's prosecution for mail fraud and related offenses survived the McCarran–Ferguson Act.[5] *See United States v. Cavin,* 39 F.3d 1299, 1305 (5th Cir.1994); *United States v. Sylvanus,* 192 F.2d 96, 100 (7th Cir.1951), *cert. denied,* 342 U.S. 943, 72 S.Ct. 555, 96 L.Ed. 701 (1952); *United States v. Schmittzehe,* Crim. A. No. 91–514, 1994 WL 635030, at *4 (E.D.La. 1994).

In *Cavin,* the defendants were charged with conspiracy to defraud state insurance regulators and policyholders, as well as other offenses including mail and wire fraud. *Id.* at 1304. Like the present case, the indictment arose out of fraudulent financial transactions affecting an insurance company's solvency. The court held that the federal government's "interest in the fraud prosecution is completely compatible with the state's regulatory interests." *Id.* It found unpersuasive a defendant's argument that he was being federally prosecuted for conduct permitted by the Insurance Commissioner of Louisiana. *Id.* Similarly in *Sylvanus,* which involved misrepresentations in the sale of insurance policies, the Seventh Circuit upheld a conviction for mail fraud and conspiracy to commit mail fraud notwithstanding the McCarran–Ferguson Act. *Sylvanus,* 192 F.2d at 99–100. It stated:

> [w]e conclude, then, that it was not the intent of the Congress, by its passage of the McCarran Act, so [sic] surrender control of the use of the mails or to cease to

---

**5.** The Fifth Circuit upheld a federal prosecution very similar to the instant case, but the McCarran–Ferguson Act was not mentioned. *See Unit-* *ed States v. Krenning,* 93 F.3d 1257 (5th Cir. 1996).

authorize the federal courts to determine whether the mails have been utilized in attempted execution of a scheme to defraud and that the district court, by entertaining jurisdiction, did not interfere with regulation of the insurance company by the state but properly overruled the motions to dismiss the indictment.

*Id.* at 100.

The Eastern District of Louisiana also employed the McCarran–Ferguson Act analysis to determine if a criminal mail fraud and conspiracy to commit mail fraud prosecution was valid. *See Schmittzehe*, 1994 WL 635030, at *1–4. There, as in *Cavin* and the present action, the indictment concerned financial manipulations of an insurance company. The court held that such a prosecution was within the federal court's jurisdiction.[6] *Id.* Under the fourth factor of the McCarran–Ferguson Act analysis, the court explained that despite the fact that the penalties differed between state and federal laws, the application of the federal mail fraud statute would not invalidate, impair, or supersede state law. *Id.* It observed that the mail fraud laws "do not instruct Louisiana how to sell, structure, or enforce an insurance policy. Nothing in the indictment limits or interferes with the power of state officials to perform their statutory duties, or to regulate [the] insurance business." *Id.*

In support of his position, Stewart cites an array of Pennsylvania insurance laws which are potentially implicated by this federal prosecution. (Mem. of Law in Supp. of Def's Mot. to Dismiss at 12–14.) He argues that a conviction on federal charges would "effectively subject Stewart's purported accounting and reporting malfeasance to penalties and disabilities vastly more severe than any envisioned by Pennsylvania's insurance laws." (Mem. at 15.) He submits that criminal sanctions completely change the remedy scheme set forth under state law, rather than just supplement that scheme. (Mem. at 16.) Stewart also contends that standards of liability between the federal and state statutes "might well differ." (Mem. at 18.) Stewart's argument misses the mark. The federal government is not challenging Pennsylvania's financial or other standards for its domestic insurance companies. Nor is it infringing upon the relationship between the insurer and its policyholder or its insured reserved to the states. *See Schmittzehe*, 1994 WL 635030 at *3.

The federal interest here is to protect the public from acts of racketeering and from use of the mails and wires for fraudulent purposes. That effort is "perfectly compatible" with the Commonwealth's interest in protecting policyholders and with its insurance regulatory responsibilities generally. *National Sec.*, 393 U.S. at 463, 89 S.Ct. at 570; *Cavin*, 39 F.3d at 1304; *Sylvanus*, 192 F.2d at 100; *Schmittzehe*, 1994 WL 635030, at *3. The prosecution of Stewart will not invalidate, impair, or supersede the laws of Pennsylvania regulating the business of insurance. It is no more intrusive than the federal government's action in *National Securities* which sought to undo the fraudulent merger of two insurance companies already approved under state insurance law. Unlike *Fabe*, there is no clash between federal and state law. The McCarran–Ferguson Act, at least under the facts alleged in this case, does not shield a person accused of criminal conduct in violation of the laws of the United States.[7]

The motion of Allen W. Stewart to dismiss the indictment will be denied.

## ORDER

AND NOW, this 21st day of February, 1997, for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that the motion of defendant Allen

---

**6.** In analyzing the third McCarran–Ferguson factor, the court stated that the activity

 involved not the relationship between insurer and insured, but rather the relationship between the insurer and the state regulators. The alleged fraudulent use of the mails did not affect the transferring or spreading of the policyholder's risk or form an integral part of the relationship between insurer and insured, nor did it consist of a practice limited to entities within the insurance industry.
 *Schmittzehe*, 1994 WL 635030 at *3.

**7.** Because Stewart does not mention the applicability of the McCarran–Ferguson Act to the money laundering charges, we will not address it.

W. Stewart to dismiss the indictment is DE-NIED.